## CITY OF HARTFORD *v.* ANDERSON FAIROAKS, INC., ET AL.
### (3368)

BORDEN, SPALLONE and BIELUCH, Js.

Argued February 10—decision released June 3, 1986

*Louis R. Pepe,* for the appellant (plaintiff).

*Louis B. Blumenfeld* filed a brief for the appellees (defendants John W. Huntington et al.).

BIELUCH, J. This appeal arises out of a judgment for the defendants John W. Huntington,[1] Henry Darbee

---

[1] On December 23, 1976, the defendant Huntington died. His executrix was substituted as a defendant on July 1, 1977.

and John L. Dollard,[2] who were the architects employed by the plaintiff in connection with the construction of the Burgdorf Health Center in Hartford. The plaintiff has appealed to this court after its motion to set aside a defendants' verdict was denied. The plaintiff claims error in several of the trial court's rulings, and in its charge to the jury. We find error.

The jury could have reasonably found the following facts. In 1966, the plaintiff contracted with the defendants for their design and construction services pertaining to the Burgdorf Health Center. Pursuant to that contract, the defendants provided the plaintiff with drawings and specifications for the project. The plaintiff then solicited bids for its construction. All of the bids received exceeded the amount which had been appropriated by the plaintiff for the facility, however, and the bids consequently were rejected.

The defendants, in particular Henry Darbee, then reworked the plans and specifications for the project subsequently built. These reworked plans included variations in the design and specifications of the built-up roof system for the building. While both designs consisted of a level structural roof to permit the subsequent addition of more floors, they were otherwise substantially different. The first design, drawn principally by Dollard, was to be based upon precast concrete planks while the second design called for a series of nine poured concrete slabs, each connected to adjoining slabs by expansion joints. Above this concrete structural roof, the two built-up roof designs each provided for several layers of material to ventilate, insulate and waterproof the roof.

[2] Prior to trial, a settlement of this case was reached between the plaintiff, the named defendant and all of the remaining defendants except the appellees, Huntington, Darbee and Dollard. A substitute complaint filed after this settlement was completed named only the appellees as defendants. Hence, the named defendant and the other original defendants are not parties to this appeal.

As built in accordance with the second set of plans and specifications, the layers of roofing, from bottom to top, consisted of a Dyzone ventilating board, covered by lightweight aggregate concrete insulation known as Zonolite, two layers of asbestos felt sheeting alternating with two layers of asphalt, and a topping of gravel. This built-up roof incorporated two addenda which had been issued separately during the final bid period: (1) the Dyzone ventilating board was substituted for urethane insulation between the roof deck and the lightweight aggregate fill; and (2) two layers of asbestos felt replaced three layers of rag felt sheeting in the roofing membrane. The Dyzone ventilating board was a new product in 1967; Zonolite was not.

The Zonolite lightweight aggregate fill used in the construction of the built-up roof was a form of cement poured into place after being mixed with large quantities of water. Darbee specified the product by name in the second design and specifications.

The focus of the plaintiff's claim for relief is upon the defendants' use of Zonolite in the construction of the built-up roof. The plaintiff claimed at trial that the defendants failed to acquaint themselves fully with the characteristics of Zonolite before using it in their design; that their design was defective because it did not permit sufficient ventilation to allow the Zonolite fill to dry properly; and that they failed to inspect the work adequately as it progressed on the project to insure the proper use and drying of the Zonolite. The plaintiff claims that these professional failures of the defendants constituted both negligence and breach of contract. After a lengthy trial, the jury returned its verdict in favor of the defendants. The plaintiff's motion to set the verdict aside was denied, and this appeal followed the judgment rendered on the verdict.

## I

The first error claimed by the plaintiff is the court's submission to the jury of three interrogatories drafted by the defendants. The plaintiff asserts that those interrogatories misstated the issues before the jury and omitted vital facts in the characterization of the roofing system in question, thereby confusing and misleading the jury.[3] We agree.

Where two or more counts have been alleged in a complaint, or when two or more causes of action are incorporated in one count, as here, the defendant has the right to save himself from the implication of a general verdict by seeking from the jury answers to apt and proper interrogatories. *Sheeler* v. *Waterbury,* 138 Conn. 111, 114–15, 82 A.2d 359 (1951). In such situations, it is the duty of the trial court, upon request, to submit such interrogatories as would accomplish this purpose. *Pentino* v. *Gallo,* 107 Conn. 242, 244, 140 A. 105 (1928).

This duty arises from the "general verdict" rule. *Gaulton* v. *Reno Paint & Wallpaper Co.,* 177 Conn. 121, 125, 412 A.2d 311 (1979); *Sheeler* v. *Waterbury,* supra; *Pentino* v. *Gallo,* supra, 244. Under that rule, "[a] general verdict for [a party] imports that the jury resolved all of the disputed issues in favor of [that party]." *Eagar*

---

[3] The jury interrogatories and the responses thereto were as follows:

"1. Did you find that the roof was defective? Yes.

"2.a. Do you find that the defendants were negligent in specifying a roofing system with dyfoam vent board, zonolite fill, a vensulation felt and a J-M 601 membrane? No.

"b. If 'yes,' was that conduct a substantial factor in causing the harm? [No response.]

"3.a. Do you find that the defendants had a duty to inspect and supervise? Yes.

"b. If so, do you find that the defendants breached that duty? No.

"c. If you find that they breached that duty, do you find that breach to have been a substantial factor in the cause of the roof failure? [No response.]"

v. *Barron,* 2 Conn. App. 468, 472, 480 A.2d 576 (1984).
Hence, if any of the theories alleged in a complaint
could properly support a plaintiff's verdict, that ver-
dict will not be overturned, even where there is error
relating to another of the theories alleged. See *Meyer*
v. *Barnes,* 2 Conn. App. 485, 489, 479 A.2d 1236 (1984).
Nonetheless, the trial court has broad discretion regard-
ing the number and content of such interrogatories.
*Freedman* v. *New York, N.H. & H. R. Co.,* 81 Conn.
601, 613–14, 71 A. 901 (1909).

Only broad general rules exist to guide the trial court
in submitting jury interrogatories: "They should gen-
erally be few in number, and never so numerous as to
confuse or perplex the jury in rendering their verdict.
They should be so clear and concise as to be readily
understood and answered by the jury. Each question
should call for a finding of but a single fact. When prac-
ticable each question should be so framed as to call for
a categorical answer. Each question should ask for the
finding of a fact and never for a conclusion of law. No
question should ask for the finding of a purely eviden-
tial fact nor of an uncontroverted fact. Although not
wholly covering, nor necessarily controlling, the deter-
mination of any issue framed, the fact sought to be
elicited must be pertinent to some issue, and one which
may be of material weight in deciding it. No interroga-
tory should be permitted, the response to which cannot
serve either to limit or explain a general verdict, or aid
in proceedings for a subsequent review of the verdict
or judgment which may be rendered." Id., 614.

The procedural rule for submitting interrogatories
to a jury is found in Practice Book § 312, which pro-
vides: "The court may submit to the jury interrogato-
ries for the purpose of explaining or limiting a general
verdict, which shall be answered and delivered to the
clerk as a part of the verdict. The clerk will take the
verdict and then the answers to the several interroga-

tories, and thereafter he will take the court's acceptance of the verdict returned and the questions as answered, and proceed according to the usual practice. The court will not accept a verdict until the interrogatories which are *essential to the verdict* have been answered." (Emphasis added.) It is the duty of the court to examine the substance of jury questionnaires to verify their appropriateness to the evidence and issues presented to the jury. If jury questionnaires are improper in form or content, it is incumbent upon the court to rephrase the interrogatories in order that they will guide the jury in reaching a proper verdict. In such event, it is preferable for the court to provide counsel with copies of its interrogatories prior to oral argument. *Gaulton* v. *Reno Paint & Wallpaper, Co.,* supra, 130.

Turning to the interrogatories in the present case, we first note that, although the plaintiff claims all three of them were erroneous, we find that only the last two were improper. The first interrogatory simply requested that the jury find whether or not the roof was defective. Although the defect was not admitted in the defendant's answer, the plaintiff acknowledges that this issue was uncontested at trial, and the jury's response simply confirmed that the basic defect upon which this case was predicated did exist. While such confirmation by the jury was unnecessary, this finding was preliminary to the jury's ultimate verdict, and therefore, it was not error for the court to submit this question.

The remaining two interrogatories, however, were improper for two reasons. First, both interrogatories 2a and 3a failed to present adequately the facts and issues of the case to the jury. Interrogatory 2a did so by failing to include, in its summary of the design of the roof, the structural poured concrete base of the roof upon which the remaining elements of the roof were built and the lack of an attachment or adhesive between

the concrete deck and the layers of built-up roofing above it. There was professional evidence that the solid concrete structural roof provided inadequate ventilation for the moisture in the Zonolite fill which was located above it and trapped by the watertight asbestos felts in the roofing membrane. The wet Zonolite was effectively sealed into the roof by the waterproof layers above and below it. The lack of an adhesive between the structural concrete base and the built-up layers above it permitted those upper layers to expand and contract, eventually causing them to crack. Interrogatory 3a similarly failed to state the factual basis for the defendants' undefined, unexplained and unlimited "duty to inspect and supervise." Both interrogatories, by misdirecting the jury's attention and by failing to direct the jury adequately to all of the relevant facts, effectively directed the jury to ignore the missing facts. The court's charge did not clarify or discuss the substance of the interrogatories. Thus, they were effectively sanctioned by the court. As such, the misdirection which the interrogatories caused to the jury was of undeniable prejudice to the plaintiff.

The second impropriety in these interrogatories is that they failed to direct the jury to other claims upon which the plaintiff's case was based. The interrogatories did not ask the jury to find whether the defendants had been negligent in using roofing products which they had not properly researched for adequacy and effectiveness in their built-up roof design. Further, the interrogatories omitted all reference to the plaintiff's breach of contract claim. These interrogatories could only have had the effect of implying to the jury that, once they answered the submitted questions, they need do no more to reach their verdict. That implication would inevitably cause the jury to ignore the two other possible theories upon which the plaintiff might have

recovered. Thus, the court's decision to submit the interrogatories to the jury as written was clearly erroneous.

II

On December 1, 1983, the defendants individually responded to the plaintiff's interrogatories, one of which sought a disclosure of those experts whom the defendants expected to call as witnesses during the trial. Their responses to this interrogatory were each a brief, "Not yet determined." These responses were supplemented, however, before overnight adjournment on February 22, 1984, at the close of the plaintiff's case after approximately three weeks of trial. Their consolidated belated response listed five experts, including the defendants Dollard and Darbee, Christopher Winsor, an architect formerly of the defendants' firm, Richard Butterfield,[4] also an architect, and Burton Karp, a roofer. The defendants asserted that these "experts" were not retained until shortly prior to their disclosure to the plaintiff. On the next day, February 23, 1984, the plaintiff objected to the admission of any expert testimony through the five named witnesses. After lengthy arguments on this issue and a brief conference in chambers, the court ruled that "to present the Court with a list of five expert witnesses in a case this old after we have been on trial for about three weeks, and after the plaintiff has finished [its] case is just too late, and I'm not going to allow these five people to testify as experts. *I think it would be prejudicial to the case and that is my ruling.*" (Emphasis added.) The court

_____

[4] The plaintiff's third claim of error is that Butterfield should not have been permitted to testify at all since he had no role whatsoever in the construction or design of the project at issue and the substance of his testimony was unrelated to this litigation. We note, however, that the plaintiff made no objection to his testimony at trial and we, therefore, conclude that this claim of error has not properly been preserved. Practice Book § 3063.

then modified its ruling to allow the witnesses to testify as "fact witnesses" without giving any expert opinion. That modified ruling was well within the court's discretionary power to limit the scope of their testimony pursuant to Practice Book § 231 (d). *Alpha Crane Service, Inc.* v. *Capitol Crane Co.,* 6 Conn. App. 60, 65–66, 504 A.2d 1376 (1986); *Sturdivant* v. *Yale-New Haven Hospital,* 2 Conn. App. 103, 107–108, 476 A.2d 1074 (1984).

During the presentation of the defendants' case, however, their counsel virtually ignored this ruling despite repeated objections and, at one point, the admonition of the court. At the beginning of his direct examination of several of these witnesses, defense counsel inquired as to their educational background, professional qualifications and credentials, as would be necessary and relevant to qualify them as experts. Prohibited expert opinion testimony and improper questioning were allowed over objection. Their qualifications and testimony could not fail to impress upon the jury their standing in the witness box as experts. For example, Dollard was asked whether he would "customarily" look into the possibility of substituting materials for those specified in the design of a building. Robert W. Bounds,[5] a structural engineer who was part of the design team involved in the planning of the Burgdorf Health Center, was questioned hypothetically whether he would have limited any "objections" regarding the built-up roof design to structural engineering aspects of the design with which he was involved, such as the structural portion of the roof. This question was asked over the plaintiff's objection, and despite Bounds' prior

[5] Although Bounds was named in the same supplemental response to the plaintiff's interrogatories as were the other five witnesses, his name was mentioned solely as a structural engineer who was also involved in the design of the subject facility along with the defendants. Thus, even in their supplemental disclosure, the defendants never declared their intent to call Bounds as an expert witness.

statement that he had no "objection" to the built-up roof design. Further, counsel asked Karp, who had recommended that the organic rag felt sheeting originally specified in the discarded design and specifications be changed to the asbestos felt sheeting subsequently used, if he considered asbestos felt to be "appropriate" for use with Zonolite.

Each of these questions constituted incursions into the area of expert testimony which the court had previously forbidden, yet the court permitted the witnesses to respond over the plaintiff's objections despite its earlier ruling and express finding of prejudice by such expert testimony. This court has expressly decried trial by ambush techniques in the past. See *Alpha Crane Service, Inc.,* v. *Capitol Crane Co.,* supra, 64–66. "The [defendants'] claim that [their witnesses were not retained as experts until just prior to the supplemental disclosure] is a tactical subterfuge, which, if left unchallenged by the court, would seriously undermine the salutary effect of the rules of discovery and production concerning expert testimony . . . . The rules of discovery are designed to make a ' "trial less a game of blindman's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practical extent." ' *United States* v. *Procter & Gamble,* 356 U.S. 677, 682, 78 S. Ct. 983, 2 L. Ed. 2d 1077 (1958)." *Sturdivant* v. *Yale-New Haven Hospital,* supra, 106.

In this case, the court's unenforced ruling barring the defendants from eliciting expert testimony from these witnesses had the effect of restricting the scope of the plaintiff's cross-examination of them, since they were shielded from their status as experts by the court's contradictory rulings. The lateness of the court's rulings allowing the subsequent testimony of these "nonexpert" witnesses also prevented the plaintiff from seeking to obtain rebuttal experts of its own. Indeed, had the court's initial ruling under the broad umbrella

of discretion been to permit expert testimony, the result to the plaintiff would have been far more equitable for it would have put the plaintiff on notice and permitted it to prepare its case and its cross-examination of the experts properly.

We have reviewed the remainder of the plaintiff's claims of error and we consider them to be without merit. The errors already found in the judgment make it unnecessary for us to identify and discuss these claims further.

There is error, the judgment is set aside and a new trial is ordered.

In this opinion the other judges concurred.