SEYMOUR HAMMER *v.* MOUNT SINAI HOSPITAL ET AL.
(8841)
(8851)

DUPONT, C. J., SPALLONE and HEIMAN, Js.

Argued March 26—decision released September 17, 1991

*John F. Scully* and *John P. Rogers,* with whom, on the brief, were *John D. Liberator, Louis B. Blumenfeld* and *Joseph A. LaBella,* for the appellants (named defendant et al.).

*Wesley W. Horton,* with whom were *William R. Moller, Louis W. Flynn, Jr.,* and, on the brief, *Susan M. Cormier,* for the appellee (plaintiff).

DUPONT, C. J. The defendants, Mount Sinai Hospital (hospital) and Douglas Whittemore, a physician employed by the hospital,[1] appeal from a judgment rendered on a general verdict in favor of the plaintiff in this malpractice action.

On August 18, 1981, the plaintiff, a podiatrist, entered the hospital for treatment of a duodenal ulcer. The plaintiff also suffered from pancreatitis, a related condition, the symptoms of which made it unsafe for him to undergo ulcer surgery. In order to control those symptoms, Kishan Tandon, the plaintiff's treating physician, decided that the plaintiff should receive high caloric intravenous feeding through a Total Parenteral Nutrition (TPN) line.

Intravenous feeding by a TPN line begins with insertion of a four inch long, large bore needle into a patient's subclavian vein, a blood vessel in the shoulder that is not visible on the surface of the skin. A catheter is then passed into the vein. Once inserted, the cath-

---

[1] During trial, the plaintiff withdrew his claims against Firoz Mistry, a physician also employed by Mount Sinai Hospital. The jury returned a verdict in favor of another defendant, Kishan Tandon, the plaintiff's treating physician. He is not a party to this appeal.

eter is attached to a drip bottle or pump that supplies the nutrient fluid. The area is numbed by novocaine, but the patient is not necessarily sedated during the insertion of the TPN line.

On August 28, 1981, Whittemore was assigned to install a TPN line for the plaintiff. The plaintiff was nervous and agitated throughout the procedure, moving his head, crying out, complaining of pain and requiring additional injections of novocaine. Whittemore was unable to insert the line on his first try.

The morning after the procedure, the plaintiff was found semiconscious, with one end of the TPN line disconnected from the nutrient source and open to the air, the other line remaining in his chest. He exhibited signs of neurological distress. Later that night, the plaintiff suffered seizures. The plaintiff eventually recovered from the worst effects of his neurological problems and left the hospital on September 9, 1981.

The plaintiff sued the defendants for damages for permanent injuries he sustained as a result of their negligence in the insertion and supervision of the TPN line. He also claimed that Whittemore performed the procedure without obtaining his informed consent.

Whittemore prepared interrogatories for the court to submit to the jury. The hospital joined in requesting that Whittemore's interrogatories be given to the jury.[2] The court rejected these interrogatories as improper and did not submit them or its own interrogatories. The jury returned a general verdict in favor of the plaintiff against Whittemore and the hospital in the amount of $460,000. Whittemore moved to set aside

[2] Although the hospital's request included those interrogatories of Whittemore relating to informed consent, it makes no claim that the plaintiff's allegations as to negligence in the failure of Whittemore to obtain the plaintiff's informed consent relate in any way to it. The hospital, thus, does not claim that the plaintiff has alleged two causes of action against it.

the verdict and for judgment notwithstanding the verdict on several grounds. The hospital also moved to set aside the verdict, as well as for judgment notwithstanding the verdict, and for a new trial and a remittitur. The trial court denied the defendants' motions.

The defendants make a multiplicity of claims.[3] See *State* v. *Pelletier,* 209 Conn. 564, 567, 552 A.2d 805 (1989). They claim (1) that the trial court improperly refused to submit interrogatories to the jury, (2) that the trial court improperly charged the jury on several issues, (3) that the trial court incorrectly refused to strike the testimony of the plaintiff's two expert witnesses, and that the evidence did not support the plaintiff on his claims, (4) that the trial court incorrectly excluded evidence of the plaintiff's income after the injury, (5) that the trial court improperly dismissed a juror, and (6) that the verdict is excessive.

I

The plaintiff's complaint incorporated two causes of action against Whittemore, one for his alleged negligence in the installation of the TPN line and the other for his alleged negligence in failing to obtain the plaintiff's informed consent.[4]

---

[3] The defendants filed a joint brief and did not separate the claims that the hospital could properly raise from the claims that Whittemore could properly raise.

[4] The plaintiff concedes that the allegations in his complaint against Whittemore regarding the failure to obtain his informed consent state a separate cause of action from his allegations against Whittemore relating to negligence in the performance of the medical procedure, although all of the allegations are contained in one count.

"The failure to make a sufficient disclosure, which is ordinarily the basis for claiming lack of informed consent, has been regarded by most courts as presenting the question, not whether there was an effective consent which would preclude an action for battery, but whether the physician had fulfilled his duty of informing the patient under the appropriate standard." *Logan* v. *Greenwich Hospital Assn.,* 191 Conn. 282, 289, 465 A.2d 294 (1983); *Shenefield* v. *Greenwich Hospital Assn.,* 10 Conn. App. 239, 246, 522 A.2d 829 (1987). A claim of lack of informed consent is an action in negligence.

Because there were two causes of action, Whittemore had a right to protect himself "from the implication of a general verdict by seeking from the jury answers to apt and proper interrogatories." *Hartford* v. *Anderson Fairoaks, Inc.,* 7 Conn. App. 591, 594, 510 A.2d 200 (1986); *Sheeler* v. *Waterbury,* 138 Conn. 111, 114–15, 82 A.2d 359 (1951); *Booker* v. *Stern,* 19 Conn. App. 322, 328, 563 A.2d 305 (1989).

There was no allegation of lack of informed consent against the hospital. The hospital was not, therefore, entitled to join in the request to submit to the jury the interrogatories proposed by Whittemore, nor was the hospital entitled to interrogatories as of right because there was only one cause of action alleged against it. Cf. *Hartford* v. *Anderson Fairoaks, Inc.,* supra. On appeal, however, the hospital claims that the failure of the trial court to submit Whittemore's interrogatories on informed consent infected the general verdict returned against the hospital. The hospital, thus, claims the benefit of any appellate ruling on this issue in Whittemore's favor. The hospital cannot claim such a benefit. The trial court clearly instructed the jury that negligence arising from any lack of informed consent was alleged only against Whittemore. A jury is presumed to follow the trial court's instructions. *State* v. *Richardson,* 214 Conn. 752, 757, 574 A.2d 182 (1990). Furthermore, there is only one cause of action against the hospital, and, therefore, the general verdict rule does not apply.

Here, the lack of informed consent claim is a different cause of action from the claim of negligence relating to the installation of the TPN line because the claims arise from a different group of facts. " 'A cause of action is that single group of facts which is claimed to have brought about an unlawful injury to the plaintiff and which entitles the plaintiff to relief." *Wade's Dairy, Inc.* v. *Fairfield,* 181 Conn. 556, 560, 436 A.2d 24 (1980)." *Levine* v. *Town Plan & Zoning Commission,* 25 Conn. App. 199, 207, 594 A.2d 9 (1991).

The implication of a general verdict, where there are two causes of action, "imports that the jury has found all the issues for the plaintiff, hence if one of these causes of action is supported by credible testimony the verdict must stand, although the other cause of action was not supported by credible testimony or authorized by law, since it cannot be known that the verdict was based upon the invalid cause of action." *Wladyka* v. *Waterbury,* 98 Conn. 305, 313, 119 A. 149 (1922); see also *Finley* v. *Aetna Life & Casualty Co.,* 202 Conn. 190, 202, 520 A.2d 208 (1987). A defendant may seek protection against such an implication by requesting a separate verdict as to each cause of action. *Sheeler* v. *Waterbury,* supra, 114. Protection against the application of the general verdict rule also may be obtained by the use of properly framed interrogatories. A court has a duty to grant a defendant's proper request for interrogatories when there are two or more causes of action. *Pentino* v. *Gallo,* 107 Conn. 242, 244, 140 A. 105 (1928); *Hartford* v. *Anderson Fairoaks, Inc.,* supra.

Even in the face of this duty, however, our cases recognize that a trial court has broad discretion to regulate the manner in which interrogatories are presented to the jury, as well as their form and content. *Gaulton* v. *Reno Paint & Wallpaper Co.,* 177 Conn. 121, 125, 412 A.2d 311 (1979); *Freedman* v. *New York, N. H. & H. R. Co.,* 81 Conn. 601, 611–15, 71 A. 901 (1909); see Practice Book § 312. Interrogatories "should generally be few in number, and never so numerous as to confuse or perplex the jury in rendering their verdict. They should be so clear and concise as to be readily understood and answered by the jury. Each question should call for a finding of but a single fact. When practicable each question should be so framed as to call for a categorical answer. Each question should ask for the finding of a fact and never for a conclusion of law. No question should ask for the finding of a purely eviden-

tial fact nor an uncontroverted fact. Although not wholly covering, nor necessarily controlling, the determination of any issue framed, the fact sought to be elicited must be pertinent to some issue, and one which may be of material weight in deciding it. No interrogatory should be permitted, the response to which cannot serve either to limit or explain a general verdict, or aid in proceedings for a subsequent review of the verdict or judgment which may be rendered." *Freedman* v. *New York, N. H. & H. R. Co.,* supra, 614.

Here, Whittemore submitted fourteen interrogatories laced with medical terms relating to both of the plaintiff's causes of action and addressing subordinate facts rather than ultimate facts. See *Pierce* v. *Albanese,* 144 Conn. 241, 261, 129 A.2d 606, appeal dismissed, 355 U.S. 15, 78 S. Ct. 36, 2 L. Ed. 2d 21 (1957). For example, one interrogatory asks, "Do you find from the evidence that the piercing was distal or beyond the vertebral artery?" Two of the interrogatories may be inconsistent because one appears to require the use of a subjective standard for the informed consent cause of action, and the other requires the use of an objective standard for the same cause of action.[5]

The trial court could reasonably have concluded that interrogatories in this form would only have confused the jury and would not have served to "limit or explain" the verdict. See *Freedman* v. *New York, N. H. & H. R. Co.,* supra. Under these circumstances, the trial court did not abuse its discretion in refusing to submit Whittemore's interrogatories to the jury.

Even if the trial court had an obligation to rephrase some of Whittemore's interrogatories for submission to the jury; see *Hartford* v. *Anderson Fairoaks, Inc.,* supra; the failure to do so here would not require the verdict against Whittemore to be set aside. This is so

[5] See discussion in text, infra.

because we conclude that the court's instructions were correct as to both causes of action against Whittemore.

Where "there are two or more distinct causes of action, a general verdict will cure an erroneous charge as to one of them." *Giglio* v. *Connecticut Light & Power Co.,* 180 Conn. 230, 232, 429 A.2d 486 (1980). Thus, if there are two or more distinct causes of action and the charge as to both is correct, there is no erroneous charge to be cured by a general verdict. A defendant in such a case would not need interrogatories in order to be saved from this implication of the general verdict rule. See *Pederson* v. *Vahidy,* 209 Conn. 510, 517, 552 A.2d 419 (1989); *Sheeler* v. *Waterbury,* supra, 115. The function of jury interrogatories is to provide a guide for the jury's reasoning, and a written chronicle of that reasoning. Clear and correct jury instructions can guide the jury in its reasoning and conclusions.

Whittemore makes many attacks on the jury instructions independent of his claim concerning the failure of the court to submit interrogatories to the jury. In particular, Whittemore attacks the court's instructions on informed consent, claiming that the court (1) failed to explain that expert testimony was required to establish the nature of the risk, (2) failed to explain that only material risks need be disclosed, and (3) failed to instruct that in order to establish causation, the plaintiff had to testify that he would have foregone treatment if fully informed.

The trial court told the jury that the standard of medical practice regarding informed consent must be based on expert testimony, and that the jury must find, from that expert testimony, whether the defendants failed to meet the standard. This instruction sufficiently informed the jury that it must rely on expert testimony in evaluating the plaintiff's claim of lack of informed consent. The court also instructed the jury that "[a]

risk is material when a reasonable person, in what the physician knows and should have known the plaintiff's position to be, would attach significance to the risk in deciding whether to forego the proposed treatment or not." This instruction properly sets forth the law. See *Logan v. Greenwich Hospital Assn.*, 191 Conn. 282, 291, 465 A.2d 294 (1983).

Whittemore's final challenge to the court's instruction on informed consent is that the court failed to instruct the jury that because the plaintiff did not testify that he would not have undergone treatment had he been fully informed, the jury could not find for the plaintiff on that issue because without this testimony the plaintiff could not establish proximate cause. There are two separate standards of proximate cause recognized in informed consent cases, namely the objective standard and the subjective standard. "Under the 'subjective' standard, the test is whether, viewed from the point at which he had to decide, the patient would have decided differently had he been properly informed. . . . Under the 'objective' standard, on the other hand, the question of causality is resolved 'in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance.' " (Citations omitted.) *Shenefield v. Greenwich Hospital Assn.*, 10 Conn. App. 239, 245 n.6, 522 A.2d 829 (1987). Our courts have not yet adopted either standard of proof of proximate causation in an informed consent cause of action. The trial court charged the jury that the standard of proof of proximate causation in an informed consent case is the objective standard.[6]

---

[6] The court charged as follows: "A plaintiff has the burden of proving not only an unjustified failure to disclose the risk of a proposed course of treatment, but that it violated the standard of care applicable, and also that the failure was the proximate cause of his injury. You will recall my earlier instructions with respect to proximate cause. Causal relationships exist when disclosure of significant risks incidental to treatment would have resulted in a decision by the patient to forego the treatment and that such with-

Resolution of Whittemore's challenge to the instructions requires that we now decide which standard of proof should be adopted for determining proximate causation.

An instruction that a plaintiff must testify that he would have foregone treatment if fully informed is a requirement of the subjective standard. The possible infirmities of such testimony, delivered in hindsight by an injured and disgruntled plaintiff, were noted by the court that first articulated the standards for proximate cause in such cases. *Canterbury* v. *Spence,* 464 F.2d 772, 790 (D.C. Cir.), cert. denied, 409 U.S. 1064, 93 S. Ct. 560, 34 L. Ed. 2d 518 (1972). We agree with that court that "[the subjective] method of dealing with the issue on causation comes in second best. It places the physician in jeopardy of the patient's hindsight and bitterness. It places the factfinder in the position of deciding whether a speculative answer to a hypothetical question is to be credited. It calls for a subjective determination solely on testimony of a patient-witness shadowed by the occurrence of the undisclosed risk." Id., 790–91. We, therefore, follow the reasoning of *Canterbury* and hold, along with a majority of jurisdictions, that the objective test is the better standard. See, e.g., *Fain* v. *Smith,* 479 So. 2d 1150, 1154 (Ala. 1985); *Cobbs* v. *Grant,* 8 Cal. 3d 229, 245, 502 P.2d 1, 104 Cal. Rptr. 505 (1972); *St. Gemme* v. *Tomlin,* 118 Ill. App. 3d 766, 769, 455 N.E.2d 294 (1983); *Woolley* v. *Henderson,* 418 A.2d 1123, 1132 (Me. 1980); *Dries*

holding of consent would have been reasonable. The particular patient's reaction had he received the information as to the risks involved is not the governing one with respect to the duty to inform. On that issue the standard is what a reasonable person in the patient's position would have decided if suitably informed of all material perils bearing significance. The occurrence of the risk naturally must be harmful to the patient."

One of the defendant's requests to charge concerned the objective standard of proof.

v. *Gregor,* 72 App. Div. 2d 231, 236, 424 N.Y.S.2d 561 (1980); *Wilkinson* v. *Vesey,* 110 R.I. 606, 624–25, 295 A.2d 676 (1972). This conclusion is consistent with our Supreme Court's adoption of the objective standard for determining the materiality of risk. *Logan* v. *Greenwich Hospital Assn.,* supra.

A further review of the jury charge shows the instructions to be correct as to the elements of a cause of action for medical malpractice in the performance of a particular procedure; *Barnes* v. *Schlein,* 192 Conn. 732, 735, 473 A.2d 1221 (1984); *Cross* v. *Huttenlocher,* 185 Conn. 390, 393, 440 A.2d 952 (1981); *Perez* v. *Mount Sinai Hospital,* 7 Conn. App. 514, 520–21, 509 A.2d 552 (1986); see D. Wright, J. Fitzgerald & W. Ankerman, Connecticut Law of Torts (3d Ed. 1991) § 88; and an action for lack of informed consent. *Logan* v. *Greenwich Hospital Assn.,* supra, 287–88 n.1. Also correct were the instructions on causation; *Cross* v. *Huttenlocher,* supra; and on inferences and circumstantial evidence. *State* v. *Englehart,* 158 Conn. 117, 121, 256 A.2d 231 (1969).[7] We conclude, therefore, that the jury rendered its decision based on correct rules of law.

## II

Both defendants make several other claims regarding the jury instructions. They claim that the court failed to comment adequately on the evidence, and that where, as here, the issues are complex and peculiar, such a failure requires reversal. " 'The degree to which reference to the evidence may be called for lies largely in the discretion of the court.' *Gorham* v. *Farmington Motor Inn, Inc.,* 159 Conn. 576, 583, 271 A.2d 94 (1970); accord *State* v. *Stepney,* 191 Conn. 233, 464 A.2d 758

---

[7] The hospital properly could join Whittemore's challenge of the instructions on medical malpractice in the performance of the particular procedure, causation and inferences. Our resolution of these issues as to Whittemore's claims also disposes of the hospital's claims.

(1983)." *Logan* v. *Greenwich Hospital Assn.*, supra, 297. "[I]f the issues are clearly enumerated and the argument of counsel has fairly presented the case, a discussion in the charge of the details of the evidence may defeat its proper purpose." *Jacques* v. *Carter,* 2 Conn. App. 27, 34, 476 A.2d 621 (1984).

Our review of the jury charge reveals that the court defined the applicable legal doctrines and, in an even-handed, concise manner, stated those facts necessary to guide the jury in its application of the law to the facts. *Logan* v. *Greenwich Hospital Assn.*, supra. In addition, this trial, although lengthy, was a straightforward malpractice action and did not require the lengthy comment the defendants request. Under these circumstances, it is not probable that the jury was misled, and the defendants are therefore not entitled to a reversal on this issue. *Jacques* v. *Carter,* supra, 35.

The defendants also take issue with the following portion of the court's charge: "As you know, Dr. Mistry was originally a defendant. The case is withdrawn as to him. So you do not consider that. You are only to consider the claims of negligence against the parties that I am instructing you about." The defendants assert that this instruction was harmful because the allegations against Mistry in a prior complaint are admissions of the plaintiff and should have been admitted as statements inconsistent with the plaintiff's position at trial under the amended complaint that contained no allegation against Mistry. In making this claim, however, the defendants both misrepresent the events at trial and take the court's instruction on liability of Mistry out of context. The original complaint was admitted as an exhibit, and, therefore, the jury had those admissions before it. See *Dreier* v. *Upjohn Co.,* 196 Conn. 242, 244, 492 A.2d 164 (1985); *Schenck* v. *Pelkey,* 176 Conn. 245, 248, 405 A.2d 665 (1978). The jury was also charged on the significance of inconsistent statements.

This was not a case, therefore, where the jury was denied the opportunity to consider an alternative theory of causation vital to the defense. In addition, when the instructions concerning Mistry are read in the context of the charge as a whole, it is obvious that the trial court was reminding the jury that the case against Mistry was withdrawn, and, therefore, that no verdict could be returned as to him. See *Wilhelm* v. *Czuczka,* 19 Conn. App. 36, 43, 561 A.2d 146 (1989). The charge as a whole was correct.

The defendants next claim that the court improperly charged the jury on the issue of damages by stating that the parties had stipulated that the plaintiff's life expectancy was 16.2 years, when, in fact, the parties had not so stipulated. The defendants also assert that this instruction prevented the jury from considering whether the plaintiff's many other health problems would have an impact on his life expectancy. We disagree.

Concerning life expectancy, the trial court charged: "I think there was one undisputed fact where the attorneys stipulated to something. And that was the life expectancy of the plaintiff. And, as I recall, it was 16.2 years. Of course, when I mention any factual matters, use your own recollection. If I mention facts and you do not believe them to be accurate, it is your recollection and not mine nor the attorneys' that you credit. But that was the stipulation I think the parties offered, life expectancy of 16.2 years." This instruction does not prevent the jury from considering whether the plaintiff, whose many medical difficulties were put into evidence, might have a shorter than average life expectancy. Furthermore, the court charged that the jury should use its own recollection of the evidence as to life expectancy. This claim has no merit.

The defendants next assert that the trial court improperly instructed the jury that the plaintiff could recover for permanent injury to his person. They claim that the plaintiff did not allege that he was permanently injured nor was there evidence adduced to establish the existence of any permanent injuries. Our review of the record shows that, contrary to the defendants' assertion, the plaintiff had alleged that all of his injuries were "of a permanent nature and will continue to cause the plaintiff severe pain, anguish and a shock to his entire system." The plaintiff's treating neurologist, Edward J. Fredericks, also testified to the plaintiff's ongoing and permanent physical problems, which he found consistent with the neurological data in the plaintiff's hospital record following his collapse after the installation of the TNP line. It was, therefore, proper for the trial court to instruct the jury on damages for permanent injuries. *Clark* v. *George B. Wuestefeld Co.,* 132 Conn. 653, 658, 46 A.2d 841 (1946).

The defendants next claim that the trial court improperly charged the jury that the plaintiff could recover damages for injuries made more serious by an underlying preexisting condition. It is axiomatic that a " 'defendant takes the plaintiff as he finds him.' " *Terminal Taxi Co.* v. *Flynn,* 156 Conn. 313, 320, 240 A.2d 881 (1968). The court here was careful to instruct the jury that the plaintiff could recover for only those injuries resulting from the defendants' negligence, and in no way implied that the preexisting condition was somehow compensable. The court correctly charged that the plaintiff was entitled to recover for the damages proximately resulting from the defendants' negligence even if the damages were greater than they otherwise would have been because of a preexisting condition. This charge was correct. Id.

## III

The defendants also claim that the testimony of the plaintiff's two expert witnesses, Richard Bassin, a general surgeon, and David Bronster, a neurologist, was based on speculation rather than fact, and that, therefore, their testimony should have been stricken. The defendants argue that if the testimony had been stricken, the evidence would have been insufficient to support the plaintiff's cause of action in negligence arising from the insertion of the TPN line. The defendants use this claim as a basis to challenge the trial court's refusal to direct a verdict for them, or to render judgment notwithstanding the verdict.

"Our review of the trial court's refusal to direct a verdict requires us to consider the evidence in the light most favorable to the prevailing party, according particular weight to the congruence of the judgment of the trial judge and the jury, who saw the witnesses and heard their testimony. . . . 'The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion.' " (Citations omitted.) *Mather* v. *Griffin Hospital,* 207 Conn. 125, 130, 540 A.2d 666 (1988); *Samose* v. *Hammer-Passero Norwalk Chiropractic Group, P.C.,* 24 Conn. App. 99, 102, 586 A.2d 614, cert. denied, 218 Conn. 903, 588 A.2d 1079 (1991). Our review of the evidence leads us to conclude that the trial court acted properly.

"In order to prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from the standard of care, and (3) a causal connection between the deviation and the claimed injury. *Pisel* v. *Stamford Hospital,* 180 Conn. 314, 334, 430 A.2d 1 (1980) . . . ." *Samose* v. *Hammer-Passero Norwalk Chiropractic*

*Group, P.C.,* supra, 102–103. The defendants claim that the plaintiff failed to prove a causal connection between the defendants' alleged deviation from the standard of care and the plaintiff's injuries. Expert opinion is necessary to establish causation in a malpractice action, and that opinion " 'must rest upon more than surmise or conjecture.' " *Shelnitz* v. *Greenberg,* 200 Conn. 58, 66, 509 A.2d 1023 (1986), quoting *Boland* v. *Vanderbilt,* 140 Conn. 520, 525, 102 A.2d 362 (1953).

At trial, Bassin opined that Whittemore had pierced the subclavian artery, which lies directly below the subclavian vein, while attempting to insert the TPN line into the plaintiff. This piercing would have caused a blood clot to form, which could have later broken up, traveled up the vertebral artery to the plaintiff's brain and resulted in a brain embolism that caused the plaintiff's neurological problems. The defendants point to the lack of medical evidence on the record to support the theory of a pierced artery because the blood Whittemore drew into the syringe attached to the needle used for inserting the TPN line was dark red venous blood, rather than bright red arterial blood. The defendants also argue that there is no support in medical literature for Bassin's theory.

"There are no precise facts that must be proved before an expert's opinion may be received in evidence. *Waldron* v. *Raccio,* 166 Conn. 608, 614, 353 A.2d 770 (1974). Rather, it is largely a matter of judicial discretion as to whether a witness has been shown to have sufficient experience and opportunity of observation to render his opinion." *Pool* v. *Bell,* 209 Conn. 536, 543, 551 A.2d 1254 (1989). Bassin testified that before trial he reviewed the hospital records and the depositions of several parties to the case, including Whittemore's and the plaintiff's, and based his opinion on the facts therein. *Shelnitz* v. *Greenberg,* supra, 67. The fact that Bassin reached a different conclusion than the defend-

ants' experts, using the same material, does not mean that his conclusion was groundless. Bassin further testified that he performed more than 100 insertions of TPN lines, and that piercing the subclavian artery does not necessarily cause *any* bleeding. In light of Bassin's testimony as to his training, experience and investigation, the trial court did not abuse its discretion in admitting his opinion as to the cause of the plaintiff's injuries. *Pool* v. *Bell,* supra, 544. Bassin also testified that Whittemore deviated from the prevailing standard of care in 1981 by attempting to insert the TNP line on a resistant patient who was not sufficiently sedated, and that this deviation caused the plaintiff's current problems. This testimony was sufficient to allow the jury reasonably to conclude that Whittemore's deviation from the standard of care was causally connected to the plaintiff's injuries.

Similarly, the defendants claim that Bronster's testimony should have been stricken because it had no basis in fact. Bronster testified regarding two theories of the cause of the plaintiff's injuries. First, he testified that, as a result of a forceful turning of the plaintiff's head, the plaintiff's subclavian artery was dissected, forming a clot that traveled to the brain. The defendants claim that there was no evidence of such a forceful turning of the plaintiff's head, or of the pain associated with an arterial dissection. The plaintiff, however, testified that he had been "more or less thrashing around" during the procedure, and that he had screamed out in pain. The assisting nurse also testified that the plaintiff was complaining of pain and was moving while Whittemore was attempting to insert the TPN line. This testimony, taken together with Bassin's testimony on the standard of care for installing a TPN line on a resistant patient, was sufficient to establish the necessary causal relationship between the defendants' alleged malpractice and the plaintiff's injuries.

Bronster also testified that the plaintiff's injuries might have been caused by a piercing of the subclavian artery. The defendants object to this testimony because Bronster testified in terms of possibilities rather than probabilities. "Although we approve generally of the 'reasonable medical probability' standard, we also note that no 'talismanic words' are mandatory. See *Healy* v. *White,* [173 Conn. 438, 444, 378 A.2d 540 (1977)] (testifying to odds and percentages is acceptable); *Boland* v. *Vanderbilt,* [140 Conn. 520, 525, 102 A.2d 362 (1953)]; 31 Am. Jur. 2d § 44 (1967 and 1987 Sup.)." *Aspiazu* v. *Orgera,* 205 Conn. 623, 632, 535 A.2d 338 (1987). Bronster did express his opinion variously in terms of likelihoods, possibilities and probabilities. It is clear from Bronster's testimony that he had concluded that Whittemore's treatment of the plaintiff was responsible for the plaintiff's injuries. His testimony thus could reasonably have been admitted by the court, and interpreted by the jury, "to meet that acceptable standard of reliability typified by the 'reasonable degree of medical certainty [or probability]' demanded in such cases." Id., 633.

The testimony of the expert witnesses for the plaintiff should not have been stricken. The jury verdict on the plaintiff's claim of negligence in the insertion of the TPN line was, therefore, supported by the evidence.

Whittemore also claims that the evidence was insufficient to support a jury verdict on the plaintiff's informed consent claim. Because we have concluded that the plaintiff's evidence on the negligence claim arising from the performance of the procedure was sufficient to support the jury's verdict and the general verdict rule applies to Whittemore, we need not reach this issue. *Pedersen* v. *Vahidy,* supra; *Finley* v. *Aetna Life & Casualty Co.,* 202 Conn. 190, 202, 520 A.2d 208 (1987).

## IV

The defendants next complain that the trial court improperly refused to admit evidence of the plaintiff's income from disability insurance to impeach his credibility. The plaintiff had testified on direct examination that, as a result of his neurological problems, he was no longer able to work as a podiatrist, and was thus incapable of providing for his elderly mother and maintaining his own home. In attempting to offer evidence of the plaintiff's disability income, the defendants argued that the income was substantial, and the evidence served both to impeach the plaintiff's credibility and to demonstrate his lack of motivation to work.

Evidence of an injured person's income or recovery from loss-reducing sources is ordinarily barred by the collateral source rule. " 'The basis of our well-established collateral source rule is that a wrongdoer shall not benefit from a windfall from an outside source.' " *Rametta* v. *Stella*, 214 Conn. 484, 489–90, 572 A.2d 978 (1990), quoting *United Aircraft Corporation* v. *International Assn. of Machinists*, 161 Conn. 79, 101–102, 285 A.2d 330 (1971), cert. denied, 404 U.S. 1016, 92 S. Ct. 675, 30 L. Ed. 2d 663 (1972). Recently, in *Baystate Moving Systems, Inc.* v. *Bowman*, 24 Conn. App. 531, 590 A.2d 462 (1991),[8] this court held that it was not improper for a court to admit evidence of a plaintiff's workers' compensation payments, as relevant to his credibility.

As with all relevant impeachment evidence, a trial court must determine whether the probative value of such evidence is outweighed by considerations of prejudice, confusion of the issues, misleading the jury,

[8] *Baystate Moving Systems, Inc.* v. *Bowman*, 24 Conn. App. 531, 590 A.2d 462 (1991), had not been decided as of the date of the defendants' motion for directed verdicts.

undue consumption of time, or unfair surprise. *Farrell* v. *St. Vincent's Hospital,* 203 Conn. 554, 563, 525 A.2d 954 (1987). In addition, "[t]he extent of cross-examination of a witness with regard to that person's credibility is within the discretion of the trial court." *State* v. *Clemons,* 168 Conn. 395, 404, 363 A.2d 33, cert. denied, 423 U.S. 855, 96 S. Ct. 104, 46 L. Ed. 2d 80 (1975). " 'Every reasonable presumption should be given in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion.' " *State* v. *Ghere,* 201 Conn. 289, 303, 513 A.2d 1226 (1986), quoting *State* v. *Briggs,* 179 Conn. 328, 333, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980).

The testimony the defendants sought to discredit was that the plaintiff could no longer pay his bills or maintain his former lifestyle. There was evidence that the plaintiff would have earned a net income of $100,000 in the year of his injury. His disability payments amounted to one third of that amount. The trial court could reasonably have found that evidence of those payments was more prejudicial than probative.

We note that the defendants were given an opportunity to impeach the plaintiff's credibility on financial issues, and did introduce evidence of the plaintiff's prior bankruptcy and evidence that contradicted his claim of earning capacity. See *State* v. *McDaniel,* 176 Conn. 131, 135, 405 A.2d 68 (1978). The offered evidence of disability income would have been cumulative because it also related to his credibility about his finances. Considering the facts and circumstances of this case, we conclude that the trial court did not abuse its discretion by excluding evidence of the plaintiff's disability insurance.

V

Before closing argument, the plaintiff apparently approached one of the jurors during a luncheon recess

and attempted to engage him in conversation. The plaintiff's counsel subsequently moved that this juror be excused. Upon inquiry by the trial court, the juror claimed he could still be impartial but expressed a preference to be excused. The court excused the juror and the sole remaining alternate juror took his place. The defendants now assert that they were denied a verdict returned by the duly selected jury and are entitled to a new trial.

"Section 51-243 (a) of the General Statutes authorizes the trial court in a civil case to add two jurors to the jury panel to serve as alternate jurors. Section 51-243 (d) provides that '[i]f, at any time, any juror shall, for any reason, become unable to further perform his duty, the court may excuse him' and substitute an alternate juror as part of the regular panel. The determination of whether a juror is unable to perform his or her duty is committed to the trial court's sound discretion." *Rokus* v. *Bridgeport,* 191 Conn. 62, 71–72, 463 A.2d 252 (1983). The juror involved in this incident claimed that his contact with the plaintiff would make it more difficult for him to reach a decision in this case. The record reveals that the trial court took this statement under serious consideration. In reviewing claims that the trial court abused its discretion "the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness; the ultimate issue is whether the court could reasonably conclude as it did . . . ." *Jacobsen* v. *Jacobsen,* 177 Conn. 259, 263, 413 A.2d 854 (1979); see *State* v. *Stankowski,* 184 Conn. 121, 154–57, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981). The court did not abuse its discretion in excusing the juror in this case.

## VI

The defendants' final claim is that the trial court improperly failed to set aside the verdict as excessive.

They assert that the $460,000 award was disproportionate to the injuries sustained because the plaintiff's chief complaints were fatigue, headache, poor handwriting and problems with his gait. They further assert that there was no competent medical evidence linking the plaintiff's complaints to the claimed malpractice. We disagree.

"Where the trial court has denied a motion to set aside a verdict as excessive, we are limited to a determination of whether the court abused its discretion, and 'its decision "can be disturbed only by considerations of the most persuasive character, as where the verdict shocks the sense of justice or the mind is convinced that it is in fact entirely disproportionate to the injury. [W. Maltbie,] Conn. App. Proc., p. 151." . . .' (Citations omitted.) *Champagne* v. *Raybestos-Manhattan, Inc.,* [212 Conn. 509, 557, 562 A.2d 1100 (1989)]." *Samose* v. *Hammer-Passero Norwalk Chiropractic Group, P.C.,* supra, 108.

The plaintiff here testified that he was no longer able to continue his practice of podiatry at an estimated net loss of $100,000 per year for the remaining ten or eleven years of his working life. He also testified that as a result of his financial loss, he was unable to maintain his former standard of living, which in this case included home care of his elderly mother. Finally, both he and Fredericks testified to his continuing physical problems, which cause the plaintiff pain and depression on a daily basis and curtail his activities. "The amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the jury." *Mather* v. *Griffin Hospital,* supra, 138. The award may have been generous, but it does not shock the conscience.

The judgment is affirmed.

In this opinion the other judges concurred.