FRANK GIULIETTI ET AL. *v.* CONNECTICUT
INSURANCE PLACEMENT FACILITY
(13099)
(13100)

PETERS, C. J., SHEA, CALLAHAN, GLASS and HULL, Js.

Argued October 6—decision released December 8, 1987

*David M. Reilly,* for the appellant-appellees (plaintiffs).

*John E. Tener,* with whom, on the brief, was *Mary T. Nicholson,* for the appellee-appellant (defendant).

SHEA, J. In this action upon a policy issued by the defendant, insuring the plaintiffs against loss by vandalism and malicious mischief to their apartment house on Starr Street, New Haven, the jury returned a verdict for the plaintiffs of $14,000.[1] After denying motions of both parties to set aside the verdict, the court rendered judgment in accordance therewith. The plaintiffs have appealed and the defendant has also appealed from the judgment. We find no error in either appeal.

The plaintiffs claim that the trial court erred: (1) in refusing to set aside the verdict as to damages because the evidence does not support the amount of the verdict; and (2) in directing a verdict for the defendant on the second count of the complaint seeking damages for its refusal to submit the determination of the amount of the loss to appraisers, as the policy provides.[2]

On its appeal the defendant claims that the court erred: (1) in failing to set aside the verdict because the evidence did not indicate that any vandalism of the apartment house had occurred on the date alleged in

---

[1] This verdict for the plaintiffs related to the first count of the complaint claiming a breach of the insurance contract. As directed by the court, the jury returned verdicts for the defendant on the second count, which sought damages for refusal of the defendant to submit to an appraisal of the loss, and also on the third count claiming the defendant was estopped from contesting the "actual cash value" as stated in the plaintiffs' proof of loss. On the fourth count, claiming a breach of the defendant's duty as an insurer to negotiate in good faith concerning an adjustment of the loss and also a violation of our Unfair Trade Practices Act (CUTPA), the jury found the issues for the defendant.

[2] The plaintiffs' brief also has raised some additional claims, "in the event new trial is ordered upon issues of liability." Those claims relate to the charge and to rulings upon pleadings and the admission of evidence. Since we conclude that no new trial is warranted, these additional issues need not be discussed.

the complaint; (2) in excluding evidence that the loss was due to other causes; and (3) in refusing to allow the defendant to amend its answer.

I

A

The first issue we consider on the plaintiffs' appeal is whether the jury could reasonably have concluded that the loss to the plaintiffs insured by the policy was $14,000. Under the insuring agreement the defendant insured the property up to the policy limit of $28,000 against the hazards specified "to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property. . . ." The insurance loss adjusters who testified in behalf of both the plaintiffs and the defendant estimated the cost of repairing the vandalism damage to the building, with an allowance for depreciation, at more than $40,000. This sum exceeded not only the policy limit, but also two valuations of the building that had been made before it was insured. At the time the policy was issued in May, 1978, the defendant obtained an appraisal that valued the building at $28,000, the limit of coverage the policy provided. The 1978 records of the New Haven tax assessor indicated a value of $24,000. These valuations were made prior to April, 1979, when the plaintiffs first reported a loss due to the vandalism of one apartment in the building, for which they were paid $4369.06 by the defendant. The damage for which this payment was made was never repaired. The plaintiffs made no repairs or improvements after they acquired the building in 1977. The last of the tenants residing in the building had moved out just before the occurrence of the vandalism loss in April, 1979.

On July 23, 1979, the policy was amended by an endorsement changing the reference to the building

"occupied as a 6 family dwelling" to read "vacant and secured." The plaintiffs produced testimony that the building had been secured by boarding up some doors and windows and by nailing others shut after the building had become vacant in April, 1979. The named plaintiff, Frank Giulietti, testified that from August through December, 1979, he visited the property every two or three weeks to observe the exterior of the building. He said that "[t]he condition was good" when he last saw the building four to six weeks prior to his discovery that the building had been vandalized.

Giulietti testified that, as a result of a telephone call he had received from a friend, he visited the Starr Street building on January 9, 1980. He then observed that the plywood boards he claimed to have placed over the windows and doors had been removed, "everything was open," many door and window frames had been removed, plumbing fixtures had been taken or damaged, pipes had been ripped out and the furnace in the basement had been stolen.

After the defendant had received notice of the plaintiffs' claim under the policy, it engaged an adjuster, Richard McKenna, to examine the building and investigate the claim. The photographs taken when he visited the premises on January 14, 1980, graphically portray the damaged condition of both the exterior and interior of the building. Doors and windows were broken or missing; large holes had been made in the plaster walls and ceilings; and the window and door frames, baseboards and other wood trim had been removed. McKenna's estimate of the cost of repairing the damage, excluding the cost of purchasing items that had been removed from the building and allowing for the vandalism damage in April, 1979, which had not been repaired, was $40,107.44. He testified that such an extensive theft of the items taken from the building would have taken three to five months to accomplish.

The defendant also presented the testimony of several witnesses residing near the building who said that the building had not been secured, as Giulietti had testified, but was readily accessible. These witnesses had seen people entering the building and removing boards and windows therefrom during the summer of 1979. Several months after the discovery of the vandalism, the plaintiffs transferred the real estate, including the building, for no consideration except the agreement of the purchaser to assume the unpaid real estate taxes. The building was later demolished.

In pursuing their claims in the fourth count of the complaint that the defendant had failed to adjust the claimed loss in good faith and had engaged in unfair trade practices, the plaintiffs introduced some correspondence between McKenna and the adjuster representing them, Meyer Biller. A letter from Biller to McKenna dated April 23, 1980, referred to "a final offer of $15,000 that [McKenna] would recommend to the company" but asserted that the plaintiffs had rejected such a figure. To this letter McKenna responded on May 1, 1980, somewhat irately,[3] that he had made no such offer but that he had "indicated to [Biller], verbally . . . that, if [Biller] didn't get to a figure below $13,000, there would be no sense in contacting the carrier as it would not be economically feasible to even think about it." In another letter dated April 18, 1980, McKenna informed the defendant that Biller had tele-

---

[3] This portion of the letter was as follows: "You indicate, in the first paragraph, that you advised the insured that we had made a final offer of $15,000, and would recommend it to the Company. Your statement goes on to indicate that, if the insured refused the *offer,* we would send a letter denying the claim in its entirety.

"*No* offer was made on this matter whatsoever!

"I am not sure if your hearing is impaired, but all I indicated to you, verbally, was that, if you didn't get to a figure below $13,000, there would be no sense in contacting the carrier as it would not be economically feasible to even think about it." (Emphasis added.)

phoned him on April 11, 1980, to report that the plaintiffs "would not go less than $20,000." In this letter McKenna also declared that he had told Biller that "if [the plaintiffs] get down around $13,000, [he] would be in a position to call [the defendant] . . . ." Neither the plaintiffs nor the defendant raised any objection to this evidence of the negotiations between the parties nor does it appear that any instructions were requested limiting the purposes for which the jury might use such evidence. No claim of error has been raised in this appeal by either party regarding the admission of this evidence or the absence of an appropriate instruction restricting its use. Even if we were to assume that the jury was influenced in arriving at its $14,000 verdict by its knowledge of these negotiations, the plaintiffs, who introduced the evidence without taking appropriate measures to avoid any such effect, are hardly in a position to complain.

Under the terms of the policy the defendant's liability was limited to the " 'actual cash value' of the property at the time of loss," unless the cost of repair or replacement of the items vandalized amounted to a lesser sum, a circumstance the defendant does not claim in this case. In determining the actual cash value of the property, the jury could consider, "under the so-called broad evidence rule, any evidence logically tending to the formation of a correct estimate of the value" of the insured property. *Sullivan* v. *Liberty Mutual Fire Ins. Co.*, 174 Conn. 229, 232, 384 A.2d 384 (1978); *Castoldi* v. *Hartford County Mutual Fire Ins. Co.*, 21 Conn. Sup. 265, 269, 154 A.2d 247 (1959). This rule afforded a wide latitude to the factfinder in this case. The jury may well have accepted the lowest appraisal of the value of the building, the $24,000 estimate made in 1978 according to the tax assessor's records, and deducted therefrom the payment of $4369.06 made for the April, 1979, vandalism damage, which was never

repaired. From the figure resulting from this calculation, $19,630.94, a further deduction may well have been made for the vandalism of the building that occurred after the April, 1979 loss but long before January 9, 1980, when Giulietti learned of the damage.[4] His testimony that the building had been secured with boards and nails was contradicted by several witnesses who testified that it was readily accessible to vagrants and children. The jury might reasonably have found that a substantial portion of the vandalism damage occurred as a result of the plaintiffs' failure to secure the building adequately, thereby rendering applicable the policy provision excluding liability "for loss occurring . . . while the hazard is increased by any means within the control or knowledge of the insured." This provision was pleaded as a special defense and the court instructed the jury upon it.

Although it is not possible to ascertain exactly how the jury arrived at the $14,000 verdict, such precision is not essential to sustain the verdict. The issue in this case was the actual cash value of the building at the time of the loss recoverable under the policy. "[Value] is a matter of opinion based on all the evidence and, at best, is one of approximation." *Richard* v. *A. Waldman*

---

[4] The insurance policy contained the following provision pertaining to the duty of the insured upon the occurrence of a loss: "The insured shall give immediate written notice to this Company of any loss, protect the property from further damage, forthwith separate the damaged and undamaged personal property, put it in the best possible order, furnish a complete inventory of the destroyed, damaged and undamaged property, showing in detail quantities, costs, actual cash value and amount of loss claimed; and within sixty days after the loss, unless such time is extended in writing by this Company, the insured shall render to this Company a proof of loss, signed and sworn to by the insured . . . ."

The plaintiffs' proof of loss, signed on February 2, 1980, was received by the defendant on February 4, 1980. The defendant did not plead this condition of the policy as a defense, nor did the court charge upon it. The provision was included, however, in the copy of the policy introduced as an exhibit and thus available to the jury during deliberations. No attempt was made to exclude this provision from the jury.

*& Sons, Inc.,* 155 Conn. 343, 348, 232 A.2d 307 (1967). "Although from the very nature of the situation the amount of loss could not be proved with exactitude, the evidence afforded a basis for a reasonable estimate by the jury of that amount." *Paiva* v. *Vanech Heights Construction Co.,* 159 Conn. 512, 517, 271 A.2d 69 (1970). The plaintiffs have not demonstrated that the amount of the verdict does not fall within the permissible range supported by the evidence.

## B

The plaintiffs' second claim of error relates to the trial court's direction of a verdict for the defendant on the second count of the complaint, which sought damages for breach of the policy clause providing for determination of the amount of the loss by appraisers.[5] The defendant concedes that it refused the plaintiffs' timely demand for appraisal of the loss in accordance with the policy. It maintains, however, that its refusal was "based on a denial of any coverage" and claims, therefore, that it was not obliged to participate in a loss appraisal proceeding that would be useless if it should prevail on its liability defenses.

---

[5] The appraisal clause of the policy provides as follows: "Appraisal. In case the insured and this Company shall fail to agree as to the actual cash value or the amount of loss, then, on the written demand of either, each shall select a competent and disinterested appraiser and notify the other of the appraiser selected within twenty days of such demand. The appraisers shall first select a competent and disinterested umpire; and failing for fifteen days to agree upon such umpire, then, on request of the insured or this Company, such umpire shall be selected by a judge of a court of record in the state in which the property covered is located. The appraisers shall then appraise the loss, stating separately actual cash value and loss to each item; and, failing to agree, shall submit their differences, only, to the umpire. An award in writing, so itemized, of any two when filed with this Company shall determine the amount of actual cash value and loss. Each appraiser shall be paid by the party selecting him and the expenses of appraisal and umpire shall be paid by the parties equally."

This clause is identical to that contained in the "standard form of fire insurance policy of the state of Connecticut." General Statutes § 38-98.

We are inclined to agree with those courts that have rejected the defendant's contention on the ground that it renders the loss appraisal clause illusory whenever an insurer resists its invocation by an insured. If the defendant's proposition were sound, it would provide "an effective and simple way to destroy the insured's right of appraisal." *Itasca Paper Co.* v. *Niagara Fire Ins. Co.,* 175 Minn. 73, 79–80, 220 N.W. 425 (1928); see *Orient Ins. Co.* v. *Skellet Co.,* 28 F.2d 968, 969 (8th Cir. 1928). A determination of the amount of the plaintiffs' loss by appraisers pursuant to the policy would not have precluded a subsequent determination of the liability issues at a trial and would greatly have shortened the duration of a trial. *Itasca Paper Co.* v. *Niagra Fire Ins. Co.,* supra.

We conclude, however, that the trial court properly directed a verdict for the defendant on this count, because the plaintiffs, by proceeding to trial before the jury upon the question of the amount of their loss, the very issue to be determined by appraisers, effectively waived their rights under the appraisal clause. This court has held that such a clause in the standard form of policy set forth in General Statutes § 38-98 constitutes an agreement to arbitrate and falls within the ambit of our arbitration statutes, General Statutes §§ 52-408 through 52-424. *Covenant Ins. Co.* v. *Banks,* 177 Conn. 273, 279, 413 A.2d 862 (1979). "[A]n arbitration clause may be waived by the parties or by the one entitled to its benefit . . . . The same result follows from going to trial without insisting upon the arbitration condition." *Batter Building Materials Co.* v. *Kirschner,* 142 Conn. 1, 11, 110 A.2d 464 (1954). We have held that the remedy provided by General Statutes § 52-411 for the appointment of an arbitrator or umpire is applicable to the standard form of loss appraisal clause and have commented that the statutory procedure is "both prompt and efficient." *Cove-*

*nant Ins. Co.* v. *Banks,* supra, 280. The plaintiffs' course of conduct in electing a jury determination of the issues for which the appraisal procedure was available constituted a waiver of their rights under that provision of the policy. See *Waterbury Teachers Assn.* v. *Waterbury,* 164 Conn. 426, 435, 324 A.2d 267 (1973). We need not discuss, as an alternative ground for upholding the direction of a verdict on the second count, the problem of assessing damages for the breach of a refusal to arbitrate in this case, where there is no basis in the evidence for determining whether the jury verdict was greater or less than the amount that appraisers might have awarded.

On the plaintiffs' appeal, we find no error.

## II

### A

We now consider the defendant's appeal. The defendant first claims that the trial court erred in refusing to set aside the verdict because the evidence did not indicate that any vandalism of the apartment house had occurred on the date alleged in the complaint.

The plaintiffs in the first count of their complaint alleged: "On January 9, 1980, during the period when the policy was in effect, the dwelling house was greatly damaged by vandalism or malicious mischief." The defendant maintains that this paragraph clearly stated that all of the alleged vandalism took place on that single day. The plaintiffs argue that this paragraph can be fairly read to imply that the damage had occurred by this date, when it was discovered. The plain language of the paragraph supports the defendant's reading. The plaintiffs would treat the word "was" as equivalent to "had been."

"Justice is not served by accepting a claim of variance [between allegations and proof] from a party who

at all times has been in a position of knowing the true state of facts." *Schaller* v. *Roadside Inn, Inc..* 154 Conn. 61, 67, 221 A.2d 263 (1966). " '[S]light linquistic ambiguity' does not serve to nullify a cause of action which is sufficiently raised to notify the defendant of its existence. *Schenck* v. *Pelkey,* 176 Conn. 245, 255, 405 A.2d 665 (1978)." *Leabo* v. *Leninski,* 2 Conn. App. 715, 721, 484 A.2d 239 (1984). While the first count of the plaintiffs' complaint stated that the vandalism took place on January 9, 1980, the defendant was well aware that the plaintiffs' theory was that the loss had occurred over the four to six week period from the last time Giulietti inspected the building until the date recited in the complaint. The defendant had taken both a statement and a deposition to that effect from the plaintiffs prior to trial. It was the defendant who during the trial presented evidence discovered during its investigation that the building had been vandalized weeks and even months before January 9, 1980. Realizing that all of the acts of vandalism could not possibly have occurred on one day, as alleged, the defendant could not reasonably have assumed that it would prevail simply because of the plaintiffs' oversight in drafting the complaint. The time has passed when such a pleading deficiency, in the absence of surprise or other prejudice, may be relied upon to defeat a cause of action.

## B

The defendant next claims that the trial court erred in excluding evidence that a large part of the loss was due to other causes, such as theft of fixtures from the building, which the defendant maintains its policy does not cover. The defendant's brief does not indicate that it took an exception to the trial court's ruling on this issue; see Practice Book § 4065 (d) (3); and we can find no exception in the transcript. Because the defendant

did not take an exception, this court will not review its claim. Practice Book §§ 288, 4185.

## C

The defendant's final claim is that the trial court erred in refusing to allow an amendment to its answer.

The defendant filed a motion on January 21, 1986,to amend its answer by adding defenses entitled "Second Special Defense" and "Fourth Special Defense."[6] In its second special defense, the defendant claimed that part of the loss had occurred as a result of theft rather than vandalism and thus was excluded from coverage. The fourth special defense maintained that the plaintiffs had failed to notify the defendant promptly about the losses as they occurred, as required by the policy.[7]

The defendant filed this motion five years and eight months after the plaintiffs had brought their complaint on May 27, 1980. The defendant filed its answer on

---

[6] The two additional special defenses were as follows:

"SECOND SPECIAL DEFENSE:

"1. In Paragraph 4 of the First Count of plaintiffs' complaint, the plaintiffs allege that the damage to the building was the result of 'vandalism or malicious mischief.'

"2. After April, 1979, numerous valuable fixtures were stolen from plaintiffs' building.

"3. To the extent that plaintiffs' claims include items of property that were stolen from the premises, the damage so sustained by the plaintiffs was sustained as the result of theft.

"4. Pursuant to line 24 of the plaintiffs' insurance policy with defendant, the defendant is not liable for such loss by theft."

"FOURTH SPECIAL DEFENSE:

"1. Lines 90 through 91 of the plaintiffs' policy with defendant, provides, in pertinent part, that the plaintiffs were obligated to give defendant immediate written notice to the defendant of any loss.

"2. The damages alleged in plaintiff's complaint occurred as the result of separate losses occurring over a long period of time.

"3. Plaintiffs failed to notify defendant immediately in writing of these losses as they occurred, and the plaintiffs thereby breached their argument with the defendant voiding the policy."

[7] See footnote 4, supra.

January 15, 1981, and did not seek to amend it until five years later. Its motion was filed just six days before the trial began on January 27, 1986.[8]

The only question for this court is whether the trial court abused its discretion in denying the defendant's motion. *Lawson* v. *Godfried,* 181 Conn. 214, 215, 435 A.2d 15 (1980); *Dubose* v. *Carabetta,* 161 Conn. 254, 263, 287 A.2d 357 (1971). In determining whether there has been an abuse of discretion, "[f]actors that should be considered include unreasonable delay, fairness to the opposing parties and the negligence of the party offering the amendment." *Dubose* v. *Carabetta,* supra. The defendant contends that the two proposed additional special defenses would not have delayed the proceedings, nor prejudiced the plaintiffs in any manner. On the other hand, the plaintiffs argue that the delay of five years between filing the answer and moving to amend it would have seriously prejudiced them.

The defendant's proposed second special defense raised for the first time in the proceedings some factually and legally intricate questions concerning an exclusion from the vandalism coverage of losses "by pilferage, theft, burglary or larceny, except that [the defendant] shall be liable for willful damage to the building(s) covered caused by burglars in gaining entrance to or exit from the building(s) or any part of the building(s)." The plaintiffs can at least make a plausible argument that a five year delay seriously prejudiced their ability to find witnesses who remembered whether property had been stolen from the building in the months before January 9, 1980. The trial court did not abuse its discretion in denying the defendant's motion in respect to the second special defense.

---

[8] This motion was filed by the attorneys who had entered their appearance on January 16, 1986, in substitution for former counsel for the defendant.

The fourth special defense advanced for the first time the issue of whether the plaintiffs had given immediate written notice of their losses. This defense also implicated the question of whether the losses had occurred as the result of either vandalism or theft over several months. Again, the delay could have prejudiced the ability of the plaintiffs to find witnesses who remembered what had happened to the building in 1979. In addition, this special defense also raised new legal questions that could have delayed the trial. The trial court did not abuse its discretion in denying the defendant's motion.

There is no error.

In this opinion the other justices concurred.