DONALD CHAPMAN ET AL. *v.* NORFOLK AND
DEDHAM MUTUAL FIRE INSURANCE
COMPANY ET AL.
(12718)

Dupont, C. J., and Foti and Hennessy, Js.

Argued June 6—decision released September 12, 1995

*Jon D. Biller*, with whom was *David Rozwaski*, for the appellants (plaintiffs).

*Stephen E. Goldman*, with whom, on the brief, were *Patricia J. Campanella* and *Linda L. Morkan*, for the appellees (defendants).

DUPONT, C. J. The plaintiffs, Donald and Linda Chapman, appeal from the judgment on a jury verdict in favor of the defendants, Norfolk & Dedham Mutual Fire Insurance Company (Norfolk & Dedham) and Nygren & Nygren, Inc., on all counts of the plaintiffs' complaint for breach of contract, bad faith, and unfair insurance practices in violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. (CUTPA), and the Connecticut Unfair Insurance Practices Act, General Statutes § 38a-815 et seq. (CUIPA). The plaintiffs claim that the trial court improperly (1) submitted confusing interrogatories to the jury, (2) admitted evidence that was highly prejudicial to the plaintiffs, and (3) refused to allow the plaintiffs to file a reply to the defendants' amended special defenses. We affirm the judgment.

Certain facts are relevant to this appeal. The plaintiffs jointly owned a home that was insured by Norfolk & Dedham under a comprehensive homeowner's insurance policy. The plaintiffs regularly paid their premiums on the policy. On February 7, 1989, there was a fire at the plaintiffs' home, resulting in damage to their real and personal property. The fire rendered the plaintiffs' home uninhabitable, and the plaintiffs had to live temporarily in a trailer. The plaintiffs notified Norfolk & Dedham of the fire and the resulting loss of property. Norfolk & Dedham hired Nygren & Nygren, Inc., as its adjuster. The defendants investigated the fire claim and concluded that the fire was the accidental result of

an electrical problem. The defendants reimbursed the plaintiffs for their losses, but a dispute arose between the parties concerning the proper assessment of the damages sustained, and the plaintiffs claimed that they were not fully reimbursed.

On July 4, 1989, a second fire totally destroyed what remained of the plaintiffs' home. The plaintiffs notified the defendants of the second fire and the resulting destruction of the family home. The defendants conducted another investigation and denied reimbursement for the loss resulting from the second fire on the basis that Donald Chapman had intentionally set this second fire and that both Donald and Linda Chapman had committed fraud and had made material misrepresentations to the defendants.[1]

The plaintiffs filed the underlying action on January 8, 1990. The first count of the complaint alleged breach of contract for the defendants' failure to reimburse the plaintiffs fully for the first fire in February, 1989, and for refusing to reimburse the plaintiffs at all for the second fire in July, 1989. The remaining counts of the complaint alleged bad faith, unfair insurance practices in violation of CUTPA and CUIPA, and intentional infliction of emotional distress.[2] The defendants denied all of the plaintiffs' allegations and claimed that no further payments were owed to the plaintiffs for the first fire. The defendants also filed special defenses claiming, inter alia, that (1) both plaintiffs had committed fraud and concealed facts and made misrepresentations to

---

[1] As part of their investigation of this second fire, the defendants examined both plaintiffs under oath. The defendants claim that during these examinations, both plaintiffs lied about their knowledge of the causes of both fires, the damage caused by the first fire, their financial condition, the location of financial documents, their reason for not filing federal income tax returns, and their whereabouts on July 4, 1989.

[2] During trial, the plaintiffs withdrew the count claiming intentional infliction of emotional distress.

the defendants, (2) both plaintiffs had been dishonest as to the cause and origin of the second fire and their financial condition, (3) the July, 1989 fire had been intentionally caused by the plaintiff Donald Chapman, and (4) both plaintiffs had failed to take adequate steps to preserve their property at and after the second fire, thereby rendering the policy void.

The case was tried to a jury.[3] The jury returned a verdict in favor of the defendants. In response to verdict interrogatories, the jury found that Linda Chapman did not set the second fire, but that Donald Chapman did. The jury also indicated on the interrogatories that both plaintiffs had made misrepresentations to the defendants and had failed to protect their property with respect to the July, 1989 fire. The jury also denied any further payment to the plaintiffs with respect to the first fire.

The plaintiffs filed a motion to set aside the verdict, which was denied. The trial court's refusal to set aside the verdict is entitled to great weight in our assessment of the plaintiffs' claims. *Norrie* v. *Heil Co.*, 203 Conn. 594, 606, 525 A.2d 1332 (1987).

I

## JURY INTERROGATORIES

Both parties submitted proposed jury interrogatories to the court. The court rejected both parties' interrogatory forms and submitted its own.[4] The jury responded

---

[3] Prior to the commencement of the trial, the plaintiffs were divorced.

[4] The court's interrogatories and the juries' responses were in relevant part as follows:

"A. Please answer the following question regarding the February, 1989 fire.

"1. Did the defendants prove that the plaintiffs intentionally misrepresented or concealed any material fact or circumstance regarding the fire loss or the insurance claim?

"Yes __✓__    No __.__

"2. Did the defendants prove that the plaintiffs intentionally gave false statements regarding any material fact regarding the fire loss or the insurance claim?

to all the interrogatories against both plaintiffs, with the exception of their finding that Linda Chapman had not started the second fire. The transcript indicates that at some point, off the record, the court, apparently in response to objections by both parties to the form of the interrogatories, had advised the parties that it would not change the form of its interrogatories before submitting them to the jury, but would wait for the verdict, and if there were inconsistent answers, would then resubmit the interrogatories for clarification.

"Yes ___✓___    No _____

"If your answer to *either* question 1 of 2 is Yes, you need not answer any further questions under A—the February, 1989 fire?

"If your answer to 1 *and* 2 is No, please answer the following question:

"3. Did the defendants fully pay the plaintiffs for damages for the February, 1989 fire? . . .

"Yes ___✓___    No _____

"If your answer to question 3 is Yes, do not answer the next three questions.

"If your answer to question 3 is No, please state the amount you find owing for:

"4. Damages to structure                    $_____

"5. Damages to contents                     $_____

"6. Additional living expenses              $_____

"B. Please answer the following question regarding the July, 1989 fire.

"1. Did the defendants prove by the preponderance of the evidence that the fire was intentionally caused by either Donald or Linda Chapman?

"Yes ___✓___    No _____

"If your answer is No, do not answer the next question. If your answer is Yes, please answer the next question.

"2. Was the fire started by Donald Chapman?

"Yes ___✓___    No _____

"3. Was the fire started by Linda Chapman?

"Yes _____    No ___✓___

"4. Did the defendants prove by the preponderance of the evidence that the plaintiffs intentionally made material misrepresentations or conceal[ed] any material fact or circumstance regarding the fire or the insurance claim?

"Yes ___✓___    No _____

"5. Did the defendants prove that the plaintiffs intentionally gave false statements regarding the fire loss or the insurance claim?

"Yes ___✓___    No _____

"6. Did the defendants prove that the plaintiffs failed to protect the house from further damage once the fire started?

"Yes ___✓___    No _____ . . . "

The jury returned its verdict as follows: "In this case the jury finds the

When the jury verdict was returned, the plaintiffs' counsel requested that the interrogatories be clarified and resubmitted to the jury.[5] Counsel for the defendants objected to the proposed resubmission.[6] The trial court initially agreed with the plaintiffs[7] and indicated it

issues in favor of the defendants as against the plaintiffs and therefore renders its verdict in favor of the defendants."

[5] The plaintiffs' counsel made the following argument: "We had previously requested the interrogatories with respect to the questions of fraud and concealment and failure to protect their property be expanded as was the arson question, that is, if the jury found fraud, to which plaintiff did they find that. Those answers—those questions were not on the interrogatories, and I think that we had indicated that if the jury came back with answers of 'yes' as to the fraud, we may send them back and ask them to answer to which plaintiffs did they find the fraud. I do request that the jury be instructed to advise whether or not have found that as to both Donald and Linda Chapman. If they have not found that as to both Plaintiffs, then there is still the possibility of an innocent party . . . I think one can just as easily interpret that as being one or both of the plaintiffs. We did specifically state that if they found an intentional loss—if the jury—if the verdict was as to both Donald and Linda Chapman as to intentional loss, then I would agree with Mr. Goldman. It was not. It was intentional loss as to Donald Chapman and not as to Linda Chapman. I don't think we should make the assumption that the jury has determined that both of them have committed fraud when they have specifically eliminated Linda as having committed arson. I think it is a very simple question to submit to the jury. Did you find that both plaintiffs committed fraud? If so, I would request nothing further on the interrogatories."

[6] The defendants' counsel argued: "Your Honor, I think that actually what—there was some discussions of doing the opposite. If the jury found that there was a 'no' to the misrepresentation of fact, the questions that were posed to the jury—starting with A1. If the defendants prove that the plaintiffs—plural. So, presumably to answer that question the jury had to find 'yes.' The jury had to find that both plaintiffs misrepresented. In fact, it was me who objected to that question. You can't—you know, even if they didn't find both plaintiffs—one did, we may under the court's innocent spouse charge—then, maybe we only would owe half of the money. But since they found in the affirmative that both plaintiffs did it, and the same would be true I think with A2, and the same would be true with B4 and B5 and B6 because the questions were plaintiffs—The questions they answered were Plaintiffs in the plural, so they found that Plaintiffs did."

[7] The trial court stated: "This might be an issue on appeal, if there is an appeal. I think it would be pretty simple for the jury to simply write it, a short note indicating that either—they found either both or only Donald Chapman. I think that the evidence was so intertwined that it would be

would resubmit the interrogatories. The defendants argued, however, that resubmitting the interrogatories might complicate rather than clarify the record, and further, that there were no inconsistencies in the answers to the interrogatories because the questions as to fraud and misrepresentation were phrased in the plural, and evidence had been presented as to both plaintiffs on those issues. The court then agreed with the defendants and ruled that the interrogatories would not be resubmitted.[8]

The plaintiffs claim that the interrogatories submitted by the court to the jury were improper because they created new defenses that were never tried, misstated the facts and were internally inconsistent because they did not separate the issues and the plaintiffs. The plaintiffs further claim that although the court instructed the jury that Linda Chapman could be an "innocent spouse," the court's interrogatories did not allow the jury to distinguish between the plaintiffs as to the issues of fraud, misrepresentation and failure to preserve and protect property, thereby resulting in prejudice toward Linda Chapman, who might have recovered as an innocent spouse if the jury had considered her separately. The plaintiffs note that the court did distinguish between the two plaintiffs in the interrogatory on arson,[9] and they argue that the court should have made

very difficult to separate one from the other, but I think this may alleviate the—any doubt on appeal. I think I'll . . . ask them to come back and indicate whether or not they found that both, or only one of the plaintiffs gave false statements, etcetera."

[8] The trial court ruled: "If they say that the answer is, both, then that clarifies. If they say otherwise, it could cause a further problem. Yes. I'm going to stand on the ruling that if they had felt it was only one, they should have answered, no. So, this is consistent with finding that both misrepresented, etcetera. So, I'm going to let the interrogatory stand. You may have an exception . . . . [I]f they felt one but not the other intentionally misrepresented, the answer should have been, no. So that is—I don't think it's ambiguous in that regard."

[9] In their reply brief, however, the plaintiffs claim that distinguishing between the plaintiffs as to the arson claim constituted plain error because

a similar distinction in its interrogatories with respect to the other special defenses. The plaintiffs also claim that the court's interrogatories improperly applied the special defenses of fraud, material misrepresentation and intentional concealment to the first fire, when the only issue as to the first fire was whether the plaintiffs had been fully reimbursed.

The defendants' first response to the plaintiffs' argument is that the plaintiffs failed to preserve this claim for appellate review. We conclude that although it is obvious that many of the pertinent legal arguments were made off the record in chambers, the "trial court record in this case contains the factual basis necessary for appellate consideration" of the plaintiffs' claim, and accordingly, we will review this claim. See *State* v. *Torres*, 230 Conn. 372, 380, 645 A.2d 529 (1994). In the alternative, the defendants argue that the verdict should stand because the interrogatory responses are consistent with the verdict.[10] The defendants argue that if the jury had determined that the defendants did not prove their special defenses with respect to both plaintiffs, they would have answered the interrogatories in the negative. We agree with the defendants.

"The function of jury interrogatories is to provide a guide for the jury's reasoning, and a written chronicle of that reasoning." *Hammer* v. *Mount Sinai Hospital*,

---

the jury should not have considered any allegations of arson as against Linda Chapman. This claim does not warrant plain error review. "Plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *White* v. *Edmonds*, 38 Conn. App. 175, 181, 659 A.2d 748 (1995).

[10] The defendants also present an alternative argument that the interrogatories are phrased correctly because they reflect the policy language, which does not allow an innocent spouse to recover, and that the trial court therefore should not have instructed the jury on the innocent spouse doctrine. Because we conclude that the interrogatories were not inconsistent with the verdict, we need not reach this alternative argument.

25 Conn. App. 702, 710, 596 A.2d 1318, cert. denied, 220 Conn. 933, 599 A.2d 384 (1991). "Where two or more counts have been alleged in a complaint, or when two or more causes of action are incorporated in one count, as here, the defendant has the right to save himself from the implication of a general verdict by seeking from the jury answers to apt and proper interrogatories. . . . In such situations, it is the duty of the trial court, upon request, to submit such interrogatories as would accomplish this purpose." (Citation omitted.) *Hartford* v. *Anderson Fairoaks, Inc.*, 7 Conn. App. 591, 594, 510 A.2d 200 (1986). "[A] trial court has broad discretion to regulate the manner in which interrogatories are presented to the jury, as well as their form and content." *Hammer* v. *Mount Sinai Hospital*, supra, 708. This court will not uphold interrogatories that misdirect the jury's attention and fail to give the jury adequate facts, because such misdirection is undeniably prejudicial, nor will this court uphold interrogatories that fail to direct the jury to other claims upon which the plaintiffs' claim was based. *Hartford* v. *Anderson Fairoaks, Inc.*, supra, 597. Furthermore, when a "verdict rests upon a factual finding contradictory to another finding of the same issue by the trier the judgment cannot stand." (Internal quotation marks omitted.) *Calabro* v. *Calabro*, 33 Conn. App. 842, 847, 639 A.2d 1046 (1994).

"Interrogatories 'should generally be few in number, and never so numerous as to confuse or perplex the jury in rendering their verdict. They should be so clear and concise as to be readily understood and answered by the jury. Each question should call for a finding of but a single fact. When practicable each question should be so framed as to call for a categorical answer. Each question should ask for the finding of a fact and never for a conclusion of law. No question should ask for the finding of a purely evidential fact nor an uncontroverted fact. Although not wholly covering, nor necessarily con-

trolling, the determination of any issue framed, the fact sought to be elicited must be pertinent to some issue, and one which may be of material weight in deciding it. No interrogatory should be permitted, the response to which cannot serve either to limit or explain a general verdict, or aid in proceedings for a subsequent review of the verdict or judgment which may be rendered.' " *Hammer* v. *Mount Sinai Hospital,* supra, 25 Conn. App. 708–709.

We conclude that the submitted interrogatories were consistent with the pleadings and the evidence and did not mislead the jury as to the factual findings it had to make. Contrary to the plaintiffs' claim, there was evidence produced at trial against Linda Chapman to support the defendants' special defenses.[11] Furthermore, the defendants' answer and special defenses alleged fraud, concealment and failure to preserve property against both plaintiffs, and, therefore, it was proper for the trial court to ask the jury to make findings with respect to both plaintiffs as to the issues of fraud, misrepresentation and failure to preserve property. Furthermore, with regard to the plaintiffs' claim that the court inappropriately applied to the second fire the special defenses relating to the first fire, we conclude that any such error was cured by the court's clear and specific instructions that the only issue to be considered as to the first fire was whether there had been full payment for the loss. See id., 709–10. Finally, we agree with the defendants that if the jury did not find that a special defense had been proved as to both plaintiffs, it could have answered in the negative. There is no inconsistency between the interrogatories and the ver-

[11] There was testimony that Linda Chapman misrepresented, among other things, her knowledge of the cause and origin of the second fire, whether the plaintiffs' financial records were destroyed in the first fire, the plaintiffs' financial condition at the time of the second fire, whether the plaintiffs filed a tax return for the year 1986, and whether she made efforts to preserve her property during and after the second fire.

dict, and, therefore, the plaintiffs' claim that the submitted interrogatories were confusing to the jury fails.

## II

## EVIDENTIARY RULINGS

The plaintiffs next claim that the trial court made several improper evidentiary rulings because it failed to balance the probative value of certain proffered items of evidence against the prejudicial effect of those items, with the result that information highly prejudicial to the plaintiffs was admitted into evidence. Specifically, the plaintiffs contest the admission of the defendants' investigative report, evidence of Donald Chapman's prior acts, testimony by one of the defendants as to the cause of the February fire, and testimony regarding a party who was unrelated to the proceedings. The plaintiffs also claim that the trial court improperly denied them the opportunity to introduce a witness who would have rebutted some of the prejudicial information introduced by the defendants. We will address each of these claims in turn. Before beginning our analysis, we note that "[t]he trial court has broad discretion to determine the relevancy of evidence, and we will not disturb a trial court's ruling on the admissibility of evidence in the absence of a clear abuse of discretion." (Internal quotation marks omitted.) *State* v. *Gant*, 231 Conn. 43, 58, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995).

Prior to the start of trial, the plaintiffs filed a motion in limine seeking to exclude evidence of prior arrests and convictions of Donald Chapman, with the exception of prior arrests or convictions of the crime of arson, evidence of any prior fire destruction of the plaintiffs' property, evidence of any alleged sexual misconduct by Donald Chapman, newspaper articles concerning any sexual misconduct or sexual assault charges against Donald Chapman, and evidence of alleged statements

by other parties concerning threats by Donald Chapman relating to the burning of property other than the property that was the subject of this litigation. The motion in limine was granted, with the exception of evidence relating to an appeal of a criminal conviction of Donald Chapman.

## A

### The Defendants' Investigative Report

We turn first to the admission of the defendants' investigative report. The report was prepared by a private investigator hired by the defendants after the plaintiffs reported the second fire. The record indicates that the plaintiffs made at least two objections to the admission of the report. The first was made when the defendants initially sought to introduce it. The court ruled that because the plaintiffs had alleged bad faith in their complaint, the report was admissible, not for the truth of the statements contained therein, but as evidence of the state of mind of the defendants and as evidence that the defendants had undertaken a thorough and fair investigation of the plaintiffs' claim when they denied payment for the second fire. The plaintiffs offered to withdraw the bad faith allegations in order to keep the report out of evidence. The court ruled, however, that the report was also relevant to the CUTPA and CUIPA claims, and the plaintiffs would have to withdraw those claims as well in order to exclude the report. The plaintiffs refused to withdraw those claims, and the report was admitted as a full exhibit. Copies of this report were given to each juror.

The plaintiffs' second objection to the admission of the report was made after the trial testimony of Kurt Nygren, of the defendant adjuster Nygren & Nygren, Inc., who made reference to statements contained in the report. That objection was also overruled on the basis that the report was not admitted for the truth of

its contents but as evidence of the defendants' state of mind when they denied the plaintiffs' second claim.

The plaintiffs claim that the admission of the report as a full exhibit resulted in the introduction of several erroneous and unsubstantiated statements regarding Donald Chapman's past behavior, thereby tainting the proceedings. The allegedly unsubstantiated statements included one to the effect that Donald Chapman had electrical training and another to the effect that he had been connected with a number of suspicious fires. The plaintiffs argue that because the defendants were claiming that the second fire was an arson fire that had been made to look electrical in nature, the prejudicial impact of those statements outweighed any probative value they might have, and, therefore, the trial court should have at the very least excluded those statements in the report.

The defendants claim that the objections to the report were untimely made, and that in any case, the investigator's report was admissible as evidence of the defendants' state of mind, which was put in issue by the plaintiffs' claims of bad faith and violations of CUTPA and CUIPA, and also as rebuttal evidence of the plaintiffs' claim that the defendants had failed to conduct a reasonable investigation based on all available information. Even if we assume arguendo that the objections were timely made, we conclude that the report was admissible as evidence of the defendants' state of mind.

"A statement made out-of-court that is offered to establish the truth of the matter contained in the statement is hearsay, and as such is inadmissible." (Internal quotation marks omitted.) *State* v. *Wideman*, 36 Conn. App. 190, 195, 650 A.2d 571 (1994), cert. denied, 232 Conn. 903, 653 A.2d 192 (1995). "An out-of-court statement is not hearsay, however, if it is offered to illustrate circumstantially the declarant's then present state of

mind, rather than to prove the truth of the matter asserted." (Internal quotation marks omitted.) Id.

The plaintiffs argued at oral argument before this court that the state of mind exception is applicable only to the state of mind of the person who actually denies an insurance claim, and because Kurt Nygren was the witness for the adjuster, not the person in the Norfolk & Dedham insurance company who actually denied the plaintiffs' claim, the state of mind exception was not applicable. We conclude that the plaintiffs interpret the state of mind exception too narrowly, and, further, that because the allegations of the plaintiffs' complaint clearly put into issue *both* the defendant insurer's and the defendant adjuster's state of mind in handling, investigating and subsequently denying the claim from the second fire, the state of mind exception was applicable to the introduction of the report.

To prove a claim for bad faith under Connecticut law, the plaintiffs were required to prove that the defendants engaged in conduct "design[ed] to mislead or to deceive . . . or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties . . . . [B]ad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will." (Internal quotation marks omitted.) *Buckman* v. *People Express, Inc.*, 205 Conn. 166, 171, 530 A.2d 596 (1987). Moreover, " '[b]ad faith' is an indefinite term that contemplates a state of mind affirmatively operating with some design or motive of interest or ill will." *Wadia Enterprises, Inc.* v. *Hirschfeld*, 27 Conn. App. 162, 169, 604 A.2d 1339, aff'd, 224 Conn. 240, 618 A.2d 506 (1992). Similarly, in order to receive punitive damages under CUTPA, the plaintiffs were required to produce evidence that the defendants'

actions had "a reckless indifference to the rights of others" or that the defendants had engaged in "an intentional and wanton violation of those rights." (Internal quotation marks omitted.) *Gargano* v. *Heyman*, 203 Conn. 616, 622, 525 A.2d 1343 (1987).

Here, both the representative of Norfolk & Dedham who actually made the decision to deny the plaintiffs' second claim, and Kurt Nygren of Nygren & Nygren, Inc., who assessed the damage incurred by the plaintiffs after the second fire, testified that they had relied extensively on the private investigator's report in making the decision to deny the claim. The testimony of both of these witnesses relevant to this claim was given during direct examination by the plaintiffs' attorney.

The plaintiffs do not deny that the report was relevant to issues raised by their complaint. Rather, they argue that its prejudicial effect far exceeded its probative value. We are not persuaded. The issue of bad faith was put into the case by the plaintiffs, and a large part of the testimony referring to the statements in the report complained of here was elicited by the plaintiffs' counsel on direct examination. "Evidence which may be [inadmissibly] prejudicial is not to be confused with [evidence] that is merely damaging . . . ." *State* v. *Waterman*, 7 Conn. App. 326, 350, 509 A.2d 518, cert. denied, 200 Conn. 807, 512 A.2d 231 (1986). "All evidence adverse to a party is, to some degree, prejudicial." *Chouinard* v. *Marjani*, 21 Conn. App. 572, 576, 575 A.2d 238 (1990).

We conclude that the private investigator's report was properly admitted as evidence of the state of mind of both defendants.

B

Prior Acts of Donald Chapman

The plaintiffs next claim that the gist of the defendants' defense was that Donald Chapman was a "vindic-

tive and dangerous" person, and that to prove this defense, the defendants introduced unsubstantiated claims regarding Donald Chapman's "character and abilities." According to the plaintiffs, these unsubstantiated claims include Donald Chapman's electrical expertise and an alleged arrest twenty years ago for sexual misconduct. The plaintiffs also complain that evidence of Donald Chapman's criminal conviction for sexual assault of a minor was admitted even though it was on appeal at the time of the trial.

The plaintiffs did not provide this court with specific references to the transcript to substantiate these claims. Our review of the trial record discloses that there was a brief colloquy between the plaintiffs' counsel and Kurt Nygren on the plaintiffs' direct examination concerning the electrical origin of the second fire. The plaintiffs' counsel asked Nygren whether he at least partially based his belief that Donald Chapman had intentionally set the fire on his "expert's observations of some drool marks on an electric box?"[12]

Presumably, the plaintiffs are complaining of certain statements regarding Donald Chapman's electrical expertise made by Nygren during his cross-examination by the defendants. During cross-examination, Nygren was asked what his understanding was of the reason that the plaintiffs' second claim was denied. His

---

[12] The complete colloquy was as follows:

"[Plaintiffs' Counsel:] Who set the second fire?

"[Nygren:] I believe Mr. Chapman did.

"[Plaintiffs' Counsel:] And you base that upon your expert's observations of some drool marks on an electric box?

"[Nygren:] I base that upon all—

"[Plaintiffs' Counsel:] Excuse me. If you can't answer yes or no, you will have ample opportunity this afternoon with your attorney, I assure you.

"[Nygren:] No.

"[Plaintiffs' Counsel:] You base it in part upon your expert's determination of drool marks on the electric box?

"[Nygren:] Partially."

response was "because Mr. Chapman burned his house down." The defendants also asked Nygren whether in cases of suspected arson, it was common for the insurance adjuster to inquire into the insured's "electrical knowledge, plumbing knowledge, [or] technical knowledge," to which Nygren again replied in the affirmative. The defendants then asked Nygren if he was aware that with the assistance of the local fire department, an insurance investigation company had concluded that the plaintiffs' second fire had been intentionally set, to which Nygren replied in the affirmative. Nygren was then asked whether the insurance investigation company had "concluded that the fire was intentionally set by someone introducing an accelerant or flammable material above the generator transfer switch." Nygren replied, "That is my understanding, yes." The defendants' counsel then asked, "And your understanding is from reading [the insurance investigator's] report," to which Nygren replied, "Yes, it is." Later, the defendants' counsel asked, "So in this case, did you, as a representative of Norfolk & Dedham, want to know, for example, whether Donald Chapman had any electrical experience or electrical expertise?" Nygren answered, "Yes, we did . . . . We obviously were interested in what kind of electrical expertise he had because of the fact that we had an electrical fire or a fire that was—that had occurred around the electrical panels in the house. We also had a fire in February of '88 that involved electrical panels."

A party who initiates discussion on a particular subject matter while examining a witness is said to have "opened the door" to questioning on that subject by the opposing party. *State* v. *Graham*, 200 Conn. 9, 13, 509 A.2d 493 (1986). This is true even when the evidence elicited by the responsive questioning would normally be inadmissible. Id. We conclude that here, because the plaintiffs specifically asked Nygren whether he based

his belief that the second fire was intentionally set on an expert's evaluation of the appearance of the electrical box at the plaintiffs' home after the second fire, the plaintiffs opened the door to the defendants' line of inquiry on cross-examination, and that, therefore, the answers elicited on cross-examination do not constitute inadmissible evidence of prior bad acts.

The private investigator's report discussed earlier also contained statements to the effect that it was believed that Donald Chapman was knowledgeable in the area of electrical wiring and that he had been convicted of a sexual assault twenty years ago. For the reasons discussed above, that report was properly admitted as a full exhibit. The plaintiffs have not demonstrated that any of the statements in that report regarding Donald Chapman's electrical expertise or conviction twenty years ago of a sexual assault were mentioned during any witnesses' testimony or were at any point introduced for their truth rather than as evidence of the defendants' state of mind when they denied the plaintiffs' claim.

Finally, the plaintiffs complain that evidence of Donald Chapman's criminal conviction for sexual assault of a minor was improperly admitted. The plaintiffs complain that because that conviction was on appeal at the time of trial, it was inadmissible. The plaintiffs have again failed to cite in their brief where in the record such evidence was introduced. Our review of the record discloses that it was the plaintiffs' attorney who introduced this evidence when, prior to commencing direct examination of Donald Chapman, counsel asked, "[a]re you the Donald Chapman who was convicted on or around July 17th of 1992 relative to a crime that involves possible imprisonment of greater than one year?" Other references were made outside the presence of the jury. The court did allow the defendants to establish, for impeachment purposes, the conviction. We could not

locate, nor did either party direct us to, other references in the record to that 1992 conviction.

"The credibility of a witness may be attacked by introducing the witness' conviction of a crime if the maximum penalty for that conviction is imprisonment exceeding one year." (Internal quotation marks omitted.) *State* v. *Webb*, 37 Conn. App. 722, 731, 657 A.2d 711 (1995). In the absence of an abuse of discretion this court will not disturb the trial court's determination as to the admissibility of a prior conviction to impeach a witness. Id., 732. Moreover, contrary to the plaintiffs' argument, the trial court may, in its discretion, admit evidence of a prior conviction for impeachment purposes despite the pendency of an appeal. *State* v. *Biller*, 5 Conn. App. 616, 623, 501 A.2d 1218 (1985), cert. denied, 199 Conn. 803, 506 A.2d 146, cert. denied, 478 U.S. 1005, 106 S. Ct. 3296, 92 L. Ed. 2d 711 (1986). The trial court here specifically ruled that the defendants could not use Donald Chapman's conviction for any purpose other than to impeach him. The plaintiffs have not demonstrated that the defendants made any other use of that evidence.

## C

### Evidence of the Cause of the February Fire

The plaintiffs next claim that the defendants improperly introduced testimony as to the origin and nature of the February, 1989 fire, neither of which was at issue.

At the beginning of the trial, the court expressly ruled that "there be no testimony regarding any claims that the February 7, 1989 fire was suspicious or had multiple origins or was anything else than an ordinary fire caused by matters not deliberate." During the plaintiffs' direct examination of Kurt Nygren, however, the plaintiffs inquired whether Nygren believed that any proofs of

loss with regard to the first fire were inaccurate.[13] During cross-examination, the defendants asked Nygren whether, "when you answered [the plaintiffs], you think all the proofs of loss relating to February may contain materials that are untrue, you were talking about the parts of proof of loss that say the fire wasn't started by one or both of the Chapmans?" Nygren replied in the affirmative. The plaintiffs objected and requested that the jury be instructed again that the cause of the February fire was not an issue. The court ruled that the plaintiff had on direct examination opened the door to allow the defendants to inquire on cross-examination as to the February fire. We agree with the trial court that the plaintiffs, by asking Nygren whether he believed that the proofs of loss relating to the first fire were inaccurate, opened the door to questions by the defendants regarding specific material in the proofs that Nygren believed to be inaccurate. See *State* v. *Graham,* supra, 200 Conn. 9. We, therefore, will not disturb the trial court's ruling.

D

Testimony Regarding the Plaintiffs' Adjuster

The plaintiffs next claim that the trial court allowed the defendants improperly to introduce a past criminal

---

[13] The colloquy was as follows:

"Q. [T]he only proof of loss that was rejected was my clients' proof of loss which was submitted for the building damages of the result of the July fire, correct?

"A. That is correct.

"Q. Were there any proof of losses having to do with the first fire that you believed to be inaccurate?

"A. In what manner, sir?

"Q. Any manner?

"A. Well, if you want to show me a proof, I will look at it. I can't recall what proofs might have been accurate or inaccurate.

"Q. Do you recall any inaccuracies in the proofs of losses submitted in connection with the first fire?

"A. As I sit here now?

charge brought against the founder of the claim adjuster's office used by the plaintiffs. During the defendants' cross-examination of Nygren, the defendants asked, "what is it about [the plaintiffs' adjusters] that makes you particularly careful when you handle claims?" Nygren answered, "Well, the founder and president . . . has been convicted on two . . . in two different cases." The plaintiffs objected. The jury was excused and the court heard arguments from both parties. The plaintiffs argued that the defendants were trying to introduce inaccurate information regarding the criminal conviction of a member of the plaintiffs' public adjusting firm, who also happened to be the plaintiffs' counsel's father, Meyer Biller. The plaintiffs argued that the conviction had been overturned and in any case was irrelevant. The defendants argued that the information was relevant not for its truth, but as a state of mind exception to the hearsay rule, because Nygren had testified on the plaintiffs' direct examination that he was particularly careful in handling claims by the plaintiffs' public adjusting firm. The defendants also offered the court a citation[14] to a case purportedly upholding Biller's conviction.

Ultimately, the court ruled that the information was admissible as state of mind testimony and instructed the jury that the "matter of Mr. Nygren's information about Meyer Biller, not counsel, but Meyer Biller, the independent adjuster member of the firm that was the public adjuster in behalf of the Chapmans in this case. And I have determined to admit evidence that Mr. Nygren had or information Mr. Nygren had about Meyer Biller. And that is admitted only to show Mr. Nygren's state of mind while he was handling this claim. So that the truth of those matters is not of concern to you. The

"Q. Yes.

"A. They may all be inaccurate."

[11] The defendants did not provide this court with that citation.

only reason it is admitted into evidence is to show Mr. Nygren's state of mind and why he handled this particular claim of the Chapmans the way he did. But that evidence is admissible, and you are going to hear it, but that is the only reason it is admissible, and for any other reason you shouldn't consider at all other than Mr. Nygren's state of mind."

The plaintiffs argue that Biller's conviction was overturned. Whether Biller was actually convicted, and whether that conviction was overturned, however, is irrelevant. The testimony was clearly ruled admissible only as evidence of the state of mind of Nygren & Nygren, Inc. As discussed previously in connection with the plaintiffs' claim that the private investigator's report was improperly admitted, the plaintiffs' allegations of bad faith and CUTPA and CUIPA violations put into issue the defendants' state of mind in denying the plaintiffs' claim. The plaintiffs introduced extensive testimony not only about the handling of the plaintiffs' claims by Nygren & Nygren, Inc., but about other claims. As did the plaintiffs, the other insureds making those claims retained the public adjusting firm of Biller & Biller to represent them in dealing with Nygren & Nygren, Inc., the independent adjuster retained by the other insurers. Biller was the representative who was actively involved in the adjustment of the other claims, and who also had some involvement with the plaintiffs' claim. During trial, the plaintiffs attempted to prove the defendants' bad faith in handling the plaintiffs' claims and the other claims. In order to rebut this testimony, the defendants elicited the testimony in dispute, that Nygren was careful in handling claims involving Biller. We conclude that the testimony was properly admitted as a state of mind exception to the hearsay rule, and that any possible prejudice to the plaintiffs was mitigated by the court's instruction. See State v. Wideman, supra, 36 Conn. App. 195.

E

## The Plaintiffs' Rebuttal Witness

The plaintiffs' final evidentiary claim is that the court improperly ruled that they could not introduce a rebuttal witness. Specifically, the plaintiffs sought to introduce the testimony of Carol Foster because one of the statements in the private investigator's report discussed previously indicated that Donald Chapman had been responsible for a fire at Foster's home. The plaintiffs argued that Foster would testify that it was her grandson, not Donald Chapman, who set the fire in her home. The trial court ruled that because the fire at Foster's home had been discussed as part of the plaintiffs' case, not the defendants', the testimony was not admissible as part of the plaintiffs' rebuttal case.

The plaintiffs argued that Foster should have been allowed to testify because of the prejudicial impact of the private investigator's report. The plaintiffs claim that the statement in the private investigator's report was unsubstantiated prejudicial evidence and that they should have been allowed to apprise the jury of the falsity of that statement.

"The admission of rebuttal evidence is ordinarily within the sound discretion of the trial court." *State* v. *Lisella*, 187 Conn. 335, 337, 445 A.2d 922 (1982). Here, because the defendants did not offer any evidence regarding Foster or her house fire, allowing Foster to testify as part of the plaintiffs' rebuttal would have improperly exceeded the scope of the defendants' case. Id. Furthermore, the plaintiffs neglect the fact that, as already discussed, the private investigator's report was admitted solely as evidence of the defendants' state of mind. Any statements in that report, therefore, with regard to the fire at Foster's home were not admitted for their truth. This claim, therefore, also fails.

## III

## REPLY TO SPECIAL DEFENSES

The plaintiffs' final claim is that the trial court improperly refused to allow them to file an answer or reply to the defendants' final set of amended special defenses.

On February 28, 1991, the defendants filed their answer and special defenses. These special defenses included allegations of misrepresentation and concealment on the part of both of the plaintiffs and allegations of arson on the part of Donald Chapman. On March 6, 1991, the plaintiffs filed a reply in the form of a general denial. The case was claimed to the jury list on March 6, 1991.

After discovery was commenced, the defendants amended their answer, with no objection from the plaintiffs, on May 21, 1991, and June 1, 1992. The plaintiffs did not file a reply to either of these amended answers. The defendants then filed another amended answer on October 30, 1992. Jury selection began on November 7, 1992.

On January 8, 1993, the plaintiffs filed a motion to strike certain language from the defendants' first six special defenses and to strike the seventh amended special defense in its entirety for the reason that the defendants had waived the right to assert any special defenses other than those already claimed in their previous answers. The trial court ruled that the motion was untimely under Practice Book § 177. The plaintiffs attempted to excuse the fact that their motion was not filed within ten days of the defendants' October 30, 1992 answer and special defenses as required by § 177. The plaintiffs claimed that they had, on November 20, 1992, moved to disqualify the defendants' counsel, and then "did not file any pleadings at all once the motion to disqualify was made because [counsel] did not think

it was appropriate to file further pleadings upon counsel who I had moved to disqualify."

The plaintiffs filed a reply, dated February 26, 1993, to the defendants' special defenses dated October 30, 1992, which also argued that the defendants had waived and were estopped from introducing any new special defenses. The trial court ruled that the reply was also untimely under § 177.

By operation of § 177 the plaintiffs' March 6, 1991 general denial of the defendants' special defenses was deemed to apply to the special defenses set forth in the October 30, 1992 answer. Section 177 provides in relevant part that "[w]hen any pleading is amended the adverse party may plead thereto within the time provided by Sec. 114 or, if he has already pleaded, alter his pleading, if he so desires, within ten days after such amendment or such other time as these rules, or the court, may prescribe . . . . If the adverse party fails to plead further, pleadings already filed by him shall be regarded as applicable as far as possible to the amended pleading."

The plaintiffs argue that the special defenses alleged by the defendants on October 30, 1992, go beyond the scope of the insurer's denial letter and previous special defenses because they allege for the first time that the plaintiffs concealed circumstances concerning an unrelated fire loss, knowledge of electricity, number of lawsuits commenced, number of arrests, and number of sexual misconduct allegations, and that, therefore, the plaintiffs should have been allowed to put the issues of waiver and estoppel before the jury. The plaintiffs also argue that because the defendants had been allowed to amend their special defenses, fairness dictates that the plaintiffs be allowed to reply to them. The plaintiffs also note that § 177 allows the trial court the discretion to extend the normal ten day filing period

for responsive pleadings and that Practice Book provisions are to be liberally interpreted. Finally, the plaintiffs cite General Statutes § 52-121[15] for the proposition that a pleading may be filed after an expiration date as long as there has not been a hearing on a motion for default judgment or nonsuit.

"The fundamental purpose of a special defense, like other pleadings, is to apprise the court and opposing counsel of the issues to be tried, so that basic issues are not concealed until the trial is underway." *Bennett* v. *Automobile Ins. Co. of Hartford*, 230 Conn. 795, 802, 646 A.2d 806 (1994). "As a general rule, facts must be pleaded as a special defense when they are consistent with the allegations of the complaint but demonstrate, nonetheless, that the plaintiff has no cause of action." Id.

An insurer should raise issues of policy limitation, even where undisputed, by way of special defense. Id. In a case where the defendant insurance company argued that it was reversible error for the trial court not to allow it to amend its answer nearly six years after the plaintiffs filed their complaint, via the addition of two additional special defenses, not originally raised, the only issue is whether the trial court had abused its discretion in denying the amendment. *Giulietti* v. *Connecticut Ins. Placement Facility*, 205 Conn. 424, 436, 534 A.2d 213 (1994).

In determining whether there has been an abuse of discretion in a ruling on a motion to amend a pleading,

---

[15] General Statutes § 52-121 (a) provides: "Any pleading in any civil action may be filed after the expiration of the time fixed by statute or by any rule of court until the court has heard any motion for judgment by default or nonsuit for failure to plead which has been filed in writing with the clerk of the court in which the action is pending."

General Statutes § 52-121 (c) provides: "No penalty for failure to plead within the time provided by any rule relating to the filing of any pleading may be imposed upon any party to any action unless the failure is a violation of an order or judgment made by the court after notice and hearing thereon."

"[f]actors that should be considered include unreasonable delay, fairness to the opposing parties and the negligence of the party offering the amendment." (Internal quotation marks omitted.) Id. The plaintiffs waited until January 8, 1993,[16] to file their motion to strike in part the defendants' special defenses, and then waited until February 26, 1993, just before presentation of evidence was to begin, to prepare their reply. We conclude that the trial court did not abuse its discretion either in accepting the defendants' amended answer on October 30, 1992, which was filed prior to jury selection, or in refusing to accept the plaintiffs' motion to strike or their reply. Rather, we conclude that those rulings appropriately reflect a consideration of the factors enumerated in *Giulietti* v. *Connecticut Ins. Placement Facility*, supra, 205 Conn. 436.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[16] Even if we assume arguendo that the plaintiffs' motion to disqualify defendants' counsel would have stayed the ten day limitation in § 177, the motion to disqualify was made on November 20, 1992, after the ten day limitation in § 177 had already run.