[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action brought by B D Molded Products, Inc. against the defendant, Travelers Casualty Surety Company. Plaintiff in its complaint alleges breach of a contract arising out of the defendant's failure to pay the plaintiff's claim for a theft loss pursuant to a commercial insurance policy. The complaint sounds in one count. The defendant has denied the principal allegations of the complaint and asserted four special defenses. The matter was tried to the Court between March 7 and April 5, 2000.
In its complaint the plaintiff has alleged that the defendant is a duly licensed insurance corporation, authorized to issue the insurance policy hereinafter referred to. In addition, the plaintiff alleges that on November 15, 1995, in consideration of the premium reserved in the policy, the defendant issued policy number 007ACM25142054 insuring the plaintiff against loss or damage, not exceeding $5,182,000.00, sustained by the theft of personal property located on the plaintiff's premises at Plat Road, Shelton, Connecticut, during the term of the policy. The policy period was November 15, 1995 through November 15, 1996. These allegations were admitted by the defendant.
The plaintiff further alleges that on or about October 21, 1996, while the policy was in effect and plaintiff was still the owner of the property, numerous plastic blow molds were stolen and have not been recovered. The defendant further alleges that the replacement value of said molds at the time of the theft was $1,499,818.00[1] and that the plaintiff has performed all the conditions on its part to be fulfilled and has given defendant due notice of the loss in accordance with the terms of the policy. All of these allegations have been denied by the defendant.
The plaintiff also alleges that the defendant has failed to pay plaintiff's claim for damages and ancillary expenses, which allegation has been admitted by the defendant and the plaintiff further states that said payments are required under the policy. This has been denied by the defendant.
In addition to the denials mentioned above, the defendant has filed four special defenses in a second amended answer. In its special defenses the defendant uses a shotgun approach simply stating that the claim is excluded by "the following provision" and then quoting verbatim the often complex wording of the provision.
In its first special defense the defendant maintains that the CT Page 11185 plaintiff's claim is excluded by a policy provision which states that the corporation will not pay for loss or damage caused by or resulting from a dishonest or criminal act by the insured, any of its partners, employees, directors, trustees, authorized representatives or anyone to whom it has entrusted the property for any purpose by such person acting alone or in collusion with others or whether or not occurring during the hours of employment. Theft by employees is not covered.
In a second special defense defendant maintains that the claim is barred by fraud as it relates to this policy and also it is voided by intentional concealing or misrepresenting a material fact concerning the policy, the covered property, its interest in the covered property, or a claim under the policy.
In a third special defense defendant maintains that the claim is barred because of the insured's failure to comply with a policy provision that provides that at the request of the defendant insured must provide a complete inventory of the damaged and undamaged property including quantities, costs, values, and amounts of loss claimed; permit the corporation to inspect the property and records proving the loss or damage and also permit them to take samples of damaged property for inspection, testing, and analysis; permit the defendant to question plaintiffs under oath, at such times as may be reasonably required, about any matter relating to the insurance or the insured's claim, including the insured's books and records, and in such event, the answers must be signed; and insured must cooperate with the defendant in the investigation or settlement of the claim.
In a fourth special defense the defendant claims that the claim is barred because of certain limitations in the policy covering a situation where property is missing but there is no physical evidence to show what happened to it.
Both parties have filed comprehensive briefs and reply briefs, and the Court has had the benefit of a complete transcript of the testimony which the Court has examined in detail.
Aside from one disputed point of law[2] there was no real dispute between the parties as to the applicability of underlying law. This falls into two basic categories: (a) the burden of proof incumbent upon the claimant and the burden of proof incumbent upon the defendant with respect to its special defenses, and (b) the question of meaning and application of the "Broad Evidence Rule".
With respect to the burden of proof the Court agrees with the plaintiff in its statement that where an insured is making a claim against a CT Page 11186 policy, it has the burden of proving that a fortuitous loss of the covered property has occurred, that the standard upon which the insured must make its claim is a fair preponderance of the evidence and that the insured need not prove the cause of the loss. Once a prima facia case has been established, the insurer has the burden of proving that an exception to coverage applies. The insured is not bound to go further and prove the exact nature of by whom or how the theft was in fact perpetrated.
As a result of the Court's ruling during trial as indicated in footnote #2, the defendant is limited, pursuant to Section GH of the policy, to payment of "actual cash value" of the claimed property. The term "actual cash value" is not defined in the policy but the Court and both parties agree that the so-called "Broad Evidence Rule" is applicable to this case. Castoldi v. Hartford County Mutual Fire Insurance Company, et al,21 Conn. Sup. 265, 269; Sullivan v. Liberty Mutual Fire InsuranceCompany, 174 Conn. 229 (1978); Grand Sheet Metal Products Company v.Aetna Casualty Surety Company, et al, 500 F. Sup. 904 (D.Conn. 1980);Giulietti, et al v. Connecticut Insurance Placement Facility,205 Conn. 424, (1987); Steiner et al. v. Middlesex Mutual AssuranceCompany, 44 Conn. App. 415 (1997).
Sullivan, supra, recognized that there are three tests in general use by courts and appraisers to determine "actual cash value": (a) market value, where there is a market; (b) replacement or reproduction costs and the (c) so-called "Broad Evidence Rule" under which any evidence logically tending to the formation of a correct estimate of the value of the destroyed or damaged property, might be considered by the trier of fact in determining "actual cash value".
In Giulietti, supra, the Court cited Sullivan and noted, "In determining the actual cash value of the property, the jury could consider, under the so-called broad evidence rule any evidence logically tending to the formation of a correct estimate of the value." The court further stated" "This rule afforded wide latitude to the fact finder in this case." "Value is a matter of opinion based on all the evidence and at best, is one of approximation." Citing Richard v. Waldman Sons,Inc., 155 Conn. 343, 348 (1967). "Although from the very nature of the situation the amount of loss could not be proved with exactitude, the. evidence afforded a basis for a reasonable estimate by the jury of that amount." Paiva v. Vanech Heights Construction Co., 159 Conn. 512, 517
(1970).
The instant case involves primarily the credibility of witnesses, the weight to be given some inconsistent statements by certain witnesses and the weight to be given to certain extraneous matters not directly connected with the molds or the theft of the molds such as the CT Page 11187 plaintiff's finances.
The basic facts in the case are that plaintiff is a business that manufactures aluminum molds (blow molds) into which liquid plastic and air are injected and from which are produced plastic products such as bottles, utility cans, plastic wheels for toys, and various other plastic products. The business is owned by three brothers, Thomas J. Outlaw III, Robert Outlaw, and Kevin Outlaw. It was purchased by these three and two other brothers, Gary and Roger Outlaw, from their father, Thomas Outlaw II. The brothers elected Thomas J. Outlaw president. Sometime in the past, Gary and Roger Outlaw had a falling out with their brothers, were discharged or resigned from their positions with the company, and for the past five years have been at odds with their father and their brothers even to the extent of not talking to any of them.
The aluminum molds are quite complex in their structure, having a variety of pipes, tubes, etc., attached, when in use, to very complex machinery and are used to produce large quantities of components for various types of toys and other useful products. Some 250 such molds, which had been taking up space in the warehouse of the company's factory, were moved into a storage trailer where they were kept under lock and key. They were all molds which were not in current use, many of them had not been used for substantial periods of time: sometimes as much as ten years. The business used many storage trailers for their products and for their materials, etc., having at one time upwards of sixty such trailers on their premises, now reduced to about thirty.
On December 21, 1996, an employee of the company discovered that the trailer in which these molds had been stored, was opened. The lock had been cut and the trailer was empty. He notified Thomas Outlaw who left his office and examined the trailer finding it empty. He reported the matter to the police. The police investigated the apparent theft and at a later time the matter was taken up by the FBI. Thomas Outlaw also reported the theft to the insurance company which had a policy covering theft up to $5 million dollars. In his initial report to the police he estimated the value of the molds at about $400,000.00, but a day or so later, at the request of the police for more detail such as size etc. of the molds plus value, he reported the value at $591,000. Later, after an appraisal of the molds by an expert, who appraised them at replacement cost, the value was placed at $1,449,818.
At the time of the theft, the plaintiff company was recovering from some very serious financial losses caused by (a) The bankruptcy of a business, "Mel Appel", for which it had expanded its facilities, its operating hours, etc., to the point where it was consuming probably fifty percent of its total business; and (b) the failure of a company then known CT Page 11188 as "Buddy L", which went into bankruptcy and left a debt of about $200,000.00.
None of the molds were ever discovered although investigated thoroughly by the insurance company, by the local police, and by the FBI. The plaintiff made a claim to the insurance company under its policy and this claim has never been paid. The insurance company first alleged that the molds disappeared as the result of deliberate acts of B D and/or its employees, and that the plaintiff made material misrepresentations to the Travelers regarding the alleged loss. Later in a first amended answer, the defendant added a third special defense alleging failure to perform certain duties outlined in the policy when a claim is made. Later it added a second amended answer in which it filed a fourth special defense of "mysterious disappearance".
The plaintiff presented numerous witnesses to substantiate its version of the facts. Most of them were ordinary factory workers, with no stake in the outcome and were unsophisticated and unknowledgeable about court procedure and often testifying as to matters four or five years old and sometimes ten years old. Occasionally, their stories differed from prior statements because of further recollections and their statements did not always agree with those of other witnesses. However, in the opinion of the Court there was never any substantial difference in the evidence of these witnesses and none ever contradicted plaintiff's claim. All of plaintiff's evidence was consistent as to all substantive issues. The defendant offered no credible evidence but relied almost exclusively upon very detailed cross-examination.
Without attempting to cover all of the minutiae by which the defendant attempted to weave a web of doubt, a few of those upon which it spent more time in cross examination and space in the brief will suffice to exhibit the nature of the defense i.e. no direct evidence but question everything.
The defense spent substantial time on the difficult financial position of B D prior to the theft.
To borrow a phrase from the plaintiff's brief the defendant attempted to have the court find that "financial hardship equals a fraudulent claim." However, the plaintiff's evidence substantiated the fact that the company was well on its way to recovery from its debts and without the aid of any insurance money. Two of the principal officers mortgaged their homes to aid and accomplish this. The company cut hours very substantially, and laid off numerous employees.
Defendant attempted, by cross-examination of the plaintiff's witnesses CT Page 11189 and dwelling on some of the inconsistencies in their statements, to attempt to establish that it was more likely than not that the alleged loss of the molds was caused by an employee and/or an officer of B D.
By bringing in some prior conversations by Richard Scianna, an employee, with respect to scrapping molds, and his desire to influence Tom Outlaw to scrap the molds, the defense attempted to show that in fact these molds had been scrapped by an employee or an officer of the company. It lacked, however, any actual evidence to that effect and it was all mere speculation.
A man named Wrigley, prepared an inventory list of the molds that were placed in the trailer at the time that they were moved. The company had never maintained inventory lists before. Wrigley was uncertain as to who told him to prepare the list, naming first Scianna and then Harris, both of whom denied ordering the list. The defense interprets this as some indication of collusion by Scianna and Harris, two employees who had been urging the management to scrap the molds. It is notable, however, that there is not one shred of credible evidence in this case to indicate that any of these molds were actually scrapped. Neither the insurance company nor the police were ever able to locate any such scrapped molds. Considering the number and mass of these molds one would expect that if they had been scrapped, it would not be too difficult to find where they were scrapped. The evidence was clear that Wrigley had made the list before the theft.
Two days after Outlaw examined the location of the theft where he saw an empty trailer and the broken lock and apparently saw the door to the trailer opened and closed, the police arrived at the scene and found the trailer loaded with cardboard and that the door could not be closed. Cardboard was often stored in trailers at this business and the cardboard was seen two days after the theft. It is not too difficult to surmise that some employee being unaware of the theft dumped the cardboard into the empty trailer. Outlaw was surprised that someone had dumped the cardboard into this particular trailer and gave orders that it was not to be used again for a long time thereafter. Outlaw's testimony that the trailer was empty at the time he saw it was uncontroverted and was backed up by the testimony of Harris, who brought the theft to his attention.
The defense attempted to establish a case of molds having been stolen by an officer or an employee (an "inside theft") by dwelling on the weight and size of the molds as an indication that only they had the opportunity and expertise to move them. The plaintiff showed that thefts of metal in the isolated neighborhood were not unusual and that anybody who wanted the molds, whether for value or scrap, could easily bring a small forklift or a hand-jack in a truck. The exterior was unguarded and CT Page 11190 the place was often closed at night and weekends.
Another area dwelt on by the defendants was an attempt to question the credibility of Thomas Outlaw by implying that his expressed suspicions that Mel Appel had perpetrated the theft was somehow an attempt to divert the insurance company away from his employee, Scianna. Defendant also questioned his two estimates as to the value of the molds. To this Court Outlaw appeared to be a man who did his best to cooperate with the insurance company, do their bidding and help to solve the crime although he had no obligation to do so.
Most of the inconsistencies, relied on in great detail by the defense were, in the opinion of the Court, due simply to uncertainty on the part of an obviously uncoached witness or refreshed recollections. None of these inconsistencies had any direct bearing upon the theft of the molds, but if the defense were to be believed, every witness lacked credibility.
The fact of the matter is that the only three witnesses offered by the defense did, in the opinion of the Court, lack credibility. These were the two brothers, Roger and Gary, whose interests were clearly adverse to the plaintiff's and who clearly indicated that they wished the plaintiffs to lose the case. The third witness was a disgruntled former employee who had been fired by Tom Outlaw. The contradictory story given by him was negated by the evidence. The plaintiff did not claim the mold to which Costello referred in his testimony.
The general impression of the Court was that the testimony of the plaintiff's unsophisticated factory workers, unused to court procedures and probably never before subjected to the detailed scrutiny of the cross-examination in this case, was frank and open and unrehearsed, and that the inconsistencies dwelt on in such detail by the defense, in general amount to nothing more than irrelevant matters and lack of memory due to time.
The defense, despite the very detailed scrutiny of the plaintiff's witnesses on cross-examination and the testimony of their own witnesses, never presented a shred of evidence that there was no theft or that there was a theft which was engineered by an employee, that there was ever any material misrepresentation lack of cooperation or that there was a mysterious disappearance. The defense simply attempted to weave a web of distrust, by piecing together the financial condition of the company prior to the theft, statements made by employees as to a desire to scrap molds, some inconsistent, but not contradictory, statements by witnesses and the cardboard in the trailer. CT Page 11191
The Court, having heard the parties, and witnessed the demeanor of the witnesses, finds all of the issues in this case for the plaintiff and with respect to each of the four separate special defenses finds for the plaintiff.
While the Court has found all the issues in favor of the plaintiff, one claim requires further explanation.
The only difficult question in this case is as to the damages to be awarded to the plaintiff. A contract of insurance such as that in question is a contract of indemnity. The intention is to place the insured in the same position as before the theft in so far as possible.
The only direct evidence as to value was that given by plaintiff's expert, Brian Flanagan, and the Court accepts that value as the replacement value of these molds. The Court is of the opinion, however, that it must take into consideration the fact that many of these molds had not been used for a long period of time. However, it must also take into consideration the possibility that these molds can be used again. Mr. Flanagan testified that old molds are often used again particularly in the toy market.
The Court finds no merit whatsoever to the defendant's claim of scrap value. The plaintiff certainly would not have devoted expensive floor space for many years and then paid for a trailer keeping these molds under lock and key, just to store scrap metals.
These molds are not such property as would depreciate in the sense of deterioration of material, becoming unusable in the future. They were such that if the plaintiff wished to do so, he could advertise them and sell them. These molds were, in a sense, money in the bank. They were the stock in trade of the manufacturer.
Despite these facts, if a manufacturer decided to produce a product for which B D had a mold, it would be less expensive for him to rent or purchase that mold from B D than to replace it, i.e., to make a new one. In such a case of course, one would normally expect to pay less for the "used" mold than for the cost of replacing it. How much less?
The molds were old and most had not been used for some time. Would they be used again? What is the likelihood of such a situation occurring?
The Court feels that there are no definite answers to these questions and that this is a situation where it must resort to equity and estimation. Thus, the Court will adopt the approach of the Wisconsin Supreme Court in Doelger and Kirsten, Inc. v. National Union Fire Ins.CT Page 11192Co. of Pittsburg, Pa., 42 Wis.2d 518, 167 N.W.2d 198. The plaintiff in its estimate of loss furnished to the police, set the present cash value at $591,000. An owner of property is competent to testify as to the value of that property. Shane v. Tabor, 5 CA 363 (1985). There was evidence that the value set by Outlaw was based on the cost of the molds when produced and would be low at today's values since he had not produced them in recent years and was not familiar with today's costs.
Since the only evidence of value in the case is Flanagan's replacement value today and Outlaw's estimate, albeit low, the Court being of the opinion that replacement cost must be discounted and being bound by the record deems it fair and within the framework of the evidence to use Outlaw's estimate as a base and Flanagan's figure as the highest value and assume that the actual cash value would be halfway between them. Thus the Court finds that the actual cash value of the stolen molds on the date of the theft was $1,020,409.
Judgment may enter for the plaintiff in the amount of $1,020,409 plus ancillary expenses referred to in the policy as they may be agreed to by the parties. If not agreed to then to be set by the Court after a hearing thereon.
Robert J. Hale, J.